**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ALFRED W. GROSS, Commissioner of
Insurance, State Corporation
Commission, as deputy receiver of
Fidelity Bankers Life Insurance
Company,
Plaintiff-Appellant,

v.

No. 98-2000

ROBERT WEINGARTEN; GERRY R.
GINSBERG; LEONARD GUBAR;
SHEARSON LEHMAN BROTHERS
HOLDINGS, INCORPORATED,
Defendants-Appellees.

ALFRED W. GROSS, Commissioner of
Insurance, State Corporation
Commission, as deputy receiver of
Fidelity Bankers Life Insurance
Company,
Plaintiff-Appellee,

v.

No. 98-2393

SHEARSON LEHMAN BROTHERS
HOLDINGS, INCORPORATED,
Defendant-Appellant,

and

ROBERT WEINGARTEN; GERRY R.
GINSBERG; LEONARD GUBAR,
Defendants.

ALFRED W. GROSS, Commissioner of
Insurance, State Corporation
Commission, as deputy receiver of
Fidelity Bankers Life Insurance
Company,
Plaintiff-Appellee,

v.

ROBERT WEINGARTEN; GERRY R.
GINSBERG; LEONARD GUBAR,
Defendants-Appellants,

and

SHEARSON LEHMAN BROTHERS
HOLDINGS, INCORPORATED,
Defendant.

No. 98-2405

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge;
Robert R. Merhige, Jr., Senior District Judge
(Retired). (CA-92-808-3)

Argued: January 28, 2000

Decided: June 30, 2000

Before WILKINSON, Chief Judge, and MICHAEL
and TRAXLER, Circuit Judges.

_____

Affirmed in part, reversed in part, and remanded by published opin-
ion. Judge Michael wrote the opinion, in which Chief Judge Wilkin-
son and Judge Traxler joined.

_____

2

**COUNSEL**

**ARGUED:** Robert Dean Perrow, WILLIAMS, MULLEN, CLARK & DOBBINS, Richmond, Virginia, for Appellant. Eric Neil Landau, CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO, Los Angeles, California, for Appellees Weingarten, Ginsberg and Gubar; Helen Lalich Duncan, LEBOEUF, LAMB, GREENE & MACRAE, L.L.P., Los Angeles, California, for Appellee Shearson Lehman. **ON BRIEF:** Howard W. Dobbins, Elizabeth Mason Hurley, WILLIAMS, MULLEN, CLARK & DOBBINS, Richmond, Virginia; Patrick H. Cantilo, CANTILO, BENNETT & WISENER, L.L.P., Austin, Texas, for Appellant. Terry Christensen, CHRISTENSEN, MILLER, FINK, JACOBS, GLASER, WEIL & SHAPIRO, Los Angeles, California; W. Davis Paxton, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellees Weingarten, Ginsberg and Gubar; Allyson S. Taketa, LEBOEUF, LAMB, GREENE & MACRAE, L.L.P., Los Angeles, California; Douglas M. Palais, Dana J. Finberg, MEZZULLO & MCCANDLISH, Richmond, Virginia, for Appellee Shearson Lehman.

_____

**OPINION**

MICHAEL, Circuit Judge:

Steven T. Foster, in his capacity as the deputy receiver for Fidelity Bankers Life Insurance Company (Fidelity Bankers), brought this lawsuit in federal court against Robert Weingarten, Gerry R. Ginsberg, Leonard Gubar, and Shearson Lehman Brothers Holdings, Inc. (Shearson).**1** The deputy receiver's sixteen-count complaint alleged that Weingarten, Ginsberg, and Gubar controlled Fidelity Bankers as directors of Fidelity Bankers itself and as directors and shareholders of its parent company, First Capital Holdings, Inc. (First Capital), and caused Fidelity Bankers to commit securities violations, various forms of fraud, and violations of Virginia corporate and insurance law. Shearson was sued on the theory that it was a controlling person by virtue of its ownership stake in First Capital. The deputy receiver

_____

**1** Foster was succeeded as deputy receiver by Alfred W. Gross.

3

further alleged that Weingarten, Ginsberg, and Gubar breached their fiduciary duty to Fidelity Bankers and that Shearson aided and abetted that breach. The defendants asserted counterclaims for exoneration, indemnification, and contribution based on their prior settlement of a policyholder class action involving many of the same claims. The counterclaims in this action were severed. After a twelve-day trial on the deputy receiver's sixteen claims, the deputy receiver voluntarily dismissed six of those claims, and the district court awarded judgment as a matter of law to the defendants on a seventh. The jury returned a verdict for the defendants on all nine of the remaining claims. Thereafter, on motion of the deputy receiver, the district court dismissed all of the counterclaims for want of jurisdiction, holding that the state receivership court had exclusive jurisdiction over all claims against Fidelity Bankers.

The deputy receiver appeals the judgment in favor of the defendants, arguing that the district court committed reversible error in certain evidentiary rulings and in its award of judgment to the defendants on the one count. The defendants cross-appeal the dismissal of their counterclaims. After considering the direct appeal, we find no reversible error and therefore affirm the jury verdict and judgment in favor of the defendants. With respect to the cross-appeal, we hold that the district court erred in concluding that it lacked subject matter jurisdiction, and we reverse on that point.

I.

We begin with the winding history of this case, which has involved proceedings before three federal district judges and the Virginia State Corporation Commission. The business in federal court has included class action settlement proceedings and a twelve-day jury trial. There was also a nine-day insolvency and rehabilitation proceeding before the State Corporation Commission.

Defendants Weingarten, Ginsberg, and Gubar were directors and shareholders of First Capital, a financial services and insurance holding company. In 1985 First Capital, acting through its subsidiaries, acquired Fidelity Bankers, an insurance company based in Richmond, Virginia, for $75 million.[2] After First Capital bought Fidelity Bank-

_____

[2] The acquisition was brought about as follows: First Capital Insurance Group, Inc., a wholly owned subsidiary of First Capital, bought one third

4

ers, Weingarten, Ginsberg, and Gubar became directors on Fidelity Bankers' ten-member board. Fidelity Bankers and First Capital then entered into an "Investment Advisory Agreement," in which First Capital agreed to counsel and advise Fidelity Bankers in its investment program, to conduct research and make recommendations for the purchase and sale of securities, and to execute buy and sell orders for Fidelity Bankers. For these services First Capital was paid a sum equal to 0.5 percent of Fidelity Bankers' invested assets each month.

After the change in ownership Fidelity Bankers began to emphasize the sale of annuities. To that end, the company introduced annuities featuring relatively high crediting rates (rates of return) and low surrender charges. The purchaser of one of these annuities paid a single premium in advance and received a guaranteed minimum rate of return over a one-year period. Each year on the anniversary date of the annuity, the purchaser had the option to either keep the annuity at whatever rate Fidelity Bankers was then offering or get his money back. A purchaser who decided to get his money back, that is, "surrender" his policy, paid little or no penalty. These annuities were extremely popular, so popular, in fact, that the company's assets increased from approximately $228 million in 1985 to approximately $4 billion by the end of 1990.

The statutory accounting rules applicable to insurance companies require that the entire cost of issuing a policy be charged in the year of sale rather than amortized, so liabilities in a growing company typically increase faster than assets. In order to pay the guaranteed rate on the annuities and to cover the expenses of writing the policies, Fidelity Bankers (like any other insurer) took the premiums that it

_____

of Fidelity Bankers' outstanding stock for $25 million. At the same time, First Capital Insurance Group formed a subsidiary holding company called F.B. Life Insurance Co. and loaned that company $50 million. After F.B. Life Insurance used the loan money to buy the remaining two thirds of Fidelity Bankers' stock, F.B. Life Insurance was merged into Fidelity Bankers. Thus, when the dust settled, First Capital owned 100 percent of First Capital Insurance Group, which owned 100 percent of Fidelity Bankers. And, Fidelity Bankers owed $50 million to First Capital Insurance Group, its parent company.

5

received from annuitants and reinvested them. Acting under the Investment Advisory Agreement, First Capital substantially increased the percentage of high yield, non-investment grade (junk) bonds in Fidelity Bankers' portfolio until 38 percent of Fidelity Bankers' assets were junk bonds. These investment decisions were approved by Fidelity Bankers' investment committee (Weingarten, Ginsberg, and Edward Simon, Fidelity Bankers' president) and were ratified by the Fidelity Bankers board.

On November 15, 1988, defendant Shearson purchased 44 percent of the stock of First Capital, which constituted 36.6 percent of the voting stock. Under its stock purchase agreement Shearson gained the right to appoint four of the six directors on First Capital's board, two of whom were Shearson employees. The following year Shearson's stock interest was diluted to 28 percent, but Shearson's four directors remained on the board.

In April 1991 a downturn in the junk bond market and adverse publicity about Fidelity Bankers' sister company in California, First Capital Life Insurance Co., sparked a substantial increase in the number of surrender requests at Fidelity Bankers. The Virginia Bureau of Insurance became concerned that Fidelity Bankers would be unable to meet the surrenders as they were tendered and that a "run on the bank" would result. Fidelity Bankers' junk bonds, if sold at that time, would have been worth considerably less than their book value and might have been insufficient to satisfy the surrenders.[3] On May 13, 1991, the Circuit Court of the City of Richmond entered an order placing Fidelity Bankers in receivership and appointing the State Corporation Commission (Commission) as receiver. Acting in its capacity as a court, see Va. Code Ann. § 38.2-1508, the Commission issued its own order appointing a deputy receiver. In that order the Commission asserted "sole and exclusive jurisdiction over all the [property belonging to Fidelity Bankers] and any claims or rights respecting such Property to the exclusion of any other court or tribunal." The Commission's order also permanently enjoined anyone with a claim

_____

**3** Under statutory accounting principles applicable to insurance companies, a bond is carried at original cost as long as the company intends to hold it to maturity. If and when a decision is made to sell the bond, the company must carry it at market value.

against Fidelity Bankers from "commencing, bringing, maintaining or further prosecuting any action at law, suit in equity, arbitration, or special or other proceeding against [Fidelity Bankers] or its estate, or the Deputy Receiver and his successors in office," except as permitted by the deputy receiver.[4]

In May 1991 First Capital and its subsidiary holding companies declared bankruptcy. The predictable result was that insurance agents, Fidelity Bankers policyholders, and First Capital securities holders and creditors filed numerous lawsuits against Shearson, Weingarten, Ginsberg, and Gubar, among others. Those actions, which alleged fraud, corporate mismanagement, and violations of the federal securities laws, were transferred to the United States District Court for the Central District of California by the Judicial Panel on Multidistrict Litigation under Multidistrict Litigation Docket No. 901. In early 1992 the parties to those actions worked out a proposed settlement. The deputy receiver appeared before the district court in California and objected to the proposed settlement of the Fidelity Bankers policyholders' claims on the ground that only the deputy receiver had the authority to litigate those claims. The district court rejected the deputy receiver's argument, and the settlement was approved on June 10, 1992.

_____

[4] The relevant portion of the Commission's order states:

> The officers, directors, trustees, partners, affiliates, agents, creditors, insureds, employees and policyholders of [Fidelity Bankers], and all other persons or entities of any nature including, but not limited to, claimants, plaintiffs, petitioners, and any governmental agencies who have any claims of any nature against [Fidelity Bankers], including crossclaims, counterclaims, and third party claims, are hereby permanently enjoined and restrained from doing or attempting to do any of the following except in accordance with the express instructions of the Deputy Receiver:
>
> . . .
>
> (b) commencing, bringing, maintaining or further prosecuting any action at law, suit in equity, arbitration, or special or other proceeding against [Fidelity Bankers] or its estate, or the Deputy Receiver and his successors in office, as Deputy Receiver thereof . . . .

Meanwhile, beginning on June 1, 1992, the Virginia Commission conducted a nine-day hearing to determine Fidelity Bankers' financial status and to consider the deputy receiver's proposed rehabilitation plan. On September 29, 1992, the Commission held that as of the date of receivership, May 13, 1991, Fidelity Bankers was insolvent by over $200 million. At the same time, the Commission approved the deputy receiver's rehabilitation plan, under which policyholders were allowed to choose between accepting similar annuities with another insurer and receiving 85 percent of the value of their Fidelity Bankers annuities in cash, with the remaining 15 percent in a two-year annuity. Policyholders were also to receive a "Plan Dividend." The Plan Dividend was intended to compensate for any decrease in the interest rate available on the substitute annuities and for policyholders' inability to surrender their annuities for cash during the two-year moratorium imposed by the deputy receiver.

In December 1992 the deputy receiver, acting on behalf of Fidelity Bankers, its creditors, and its policyholders, sued Shearson and the individual defendants in the United States District Court for the Eastern District of Virginia, alleging violations of federal and state securities laws, breach of fiduciary duty, negligence, various forms of fraud, conspiracy, waste of corporate assets, unjust enrichment, disbursement of illegal dividends, fraudulent or voidable transfers, issuance of insurance after insolvency, and combined action to injure Fidelity Bankers in its reputation, trade, or business. In essence, the deputy receiver alleged that the defendants pursued a reckless investment strategy that was inappropriate for an insurer, while deliberately causing Fidelity Bankers to inflate its surplus in order to conceal its lack of capital and its precarious financial position. The defendants counterclaimed. Weingarten, Ginsberg, and Gubar claimed an equitable right to exoneration and contribution as well as equitable, statutory, and contractual rights to indemnification by Fidelity Bankers (and hence, the deputy receiver as Fidelity Bankers' successor) for their outlays in settling the class action. Shearson likewise made claims for equitable exoneration, indemnification, and contribution.

On February 17, 1993, the Multidistrict Litigation Panel transferred this case to the Central District of California (Judge Davies). There, the deputy receiver moved for partial summary judgment, arguing that the defendants were estopped from contesting either the Commis-

8

sion's determination of insolvency or the Commission's finding that the rehabilitation plan was necessary to make the policyholders whole. The district court denied the motion, holding that since neither the individual defendants nor Shearson were parties to the June 1992 Commission proceeding, they could not be bound by it. The defendants also moved for partial summary judgment on the ground that they had already settled (with the policyholders themselves) the deputy receiver's claims on behalf of policyholders. The district court granted that motion, holding that the deputy receiver could only pursue claims on behalf of Fidelity Bankers itself or its creditors.

The Multidistrict Litigation Panel sent this case back to the Eastern District of Virginia on December 30, 1996. The defendants then moved for summary judgment on the damages issue, arguing that because the policyholders' settled claims had been removed from the case, Fidelity Bankers had sufficient assets to pay all remaining claims against it. The district court in Eastern Virginia denied the motion, stating that it disagreed with the California district court's disposition of the deputy receiver's claims made on behalf of policyholders. Instead, the district court in Virginia reasoned that policyholders still had claims against Fidelity Bankers (which had not participated in the California settlement) and that Fidelity Bankers could sue the defendants on the theory that they had rendered the company unable to fulfill its contractual obligations to its policyholders. The district court went on to hold that under the Rooker-Feldman doctrine, the defendants were precluded from challenging the propriety of the rehabilitation plan or the compensation it provided to policyholders.

In anticipation of trial the district court also ruled on various motions in limine. On motion of the deputy receiver, the court excluded (1) evidence of the financial condition of the Fidelity Bankers estate that might be inconsistent with the Commission's September 29, 1992, order finding Fidelity Bankers insolvent by some $200 million, (2) evidence of pre-receivership acts or omissions by the Virginia Bureau of Insurance offered to show that such conduct contributed to the demise of Fidelity Bankers, and (3) evidence of the settlement of the Fidelity Bankers policyholder claims to show that those policyholders already had been made whole. At the same time, the court refused to exclude (1) evidence of post-receivership acts or

9

omissions by the deputy receiver offered to show that such conduct contributed to the damages suffered by policyholders and (2) evidence of the junk bond market's recovery and Fidelity Bankers' financial condition subsequent to May 13, 1991. Finally, the district court bifurcated the trial into liability and damages phases and severed the defendants' counterclaims, staying discovery on those claims and deferring decision on the deputy receiver's motion to dismiss. As we said in the introduction, after a twelve-day jury trial on liability the deputy receiver voluntarily dismissed six of his counts. The district court granted judgment as a matter of law to the defendants on the deputy receiver's claim for violation of the Virginia securities laws. The jury found in favor of the defendants on the remaining nine counts.**5** The deputy receiver's motion for a new trial was denied.

Judge Merhige, who had presided over the trial, retired shortly thereafter. This case was then transferred to Judge Williams for disposition of the defendants' counterclaims. On the deputy receiver's motion to dismiss, the district court held that "the Commission's receivership order establishing an exclusive forum for resolution of all claims against Fidelity Bankers is entitled to full faith and credit and divests this Court of subject matter jurisdiction." Gross v. Weingarten, 18 F. Supp.2d 616, 620 (E.D. Va. 1998). The district court then granted judgment to the deputy receiver.

The deputy receiver appeals the jury verdict against him, claiming that the district court committed reversible error by admitting certain defense evidence. He also appeals the district court's judgment as a matter of law on the Virginia Securities Act claim and its denial of his motion for new trial. The defendants cross-appeal the dismissal of their counterclaims.

_____

**5** These remaining nine counts were, as to all defendants, (1) intentional breach of fiduciary duty, (2) fraud, (3) constructive fraud, and (4) punitive damages; as to Weingarten, Ginsberg, and Gubar, (5) wilful, wanton, and negligent breach of fiduciary duty, (6) unlawful distribution of Fidelity Bankers' funds, and (7) issuance of additional insurance after insolvency; and, as to Shearson, (8) aiding and abetting intentional breach of fiduciary duty and (9) negligence, gross negligence, and wilful and wanton negligence in controlling Fidelity Bankers.

10

II.

The deputy receiver argues that the district court erred by permitting the defendants to introduce (1) evidence of actions taken by the Bureau of Insurance before Fidelity Bankers entered receivership, (2) evidence of the financial condition of Fidelity Bankers that was inconsistent with the Commission's September 1992 order finding Fidelity Bankers insolvent and approving the rehabilitation plan, and (3) evidence of the post-receivership conduct of the deputy receiver. According to the deputy receiver, the defendants used this evidence to blur the distinction between the deputy receiver, acting on behalf of Fidelity Bankers, and the Bureau of Insurance, acting as a regulator. As a result, the deputy receiver contends, the jury mistakenly imputed the Bureau's misconduct to the deputy receiver and impermissibly found the deputy receiver contributorily negligent for the harms suffered by Fidelity Bankers, its policyholders, and its creditors. The defendants dispute this characterization of the evidence and their use of it, arguing (1) that the evidence of the Bureau's pre-receivership conduct was properly admitted for other purposes and (2) that the defendants were entitled to show that it was the deputy receiver's mismanagement of Fidelity Bankers, not their own, that left the company unable to meet its obligations. We agree with the defendants and find no error in the admission of this evidence.

A.

First, the deputy receiver complains, the defendants introduced evidence that the Bureau had approved some of the transactions that the deputy receiver claimed constituted negligence, fraud, or breaches of fiduciary duty. Such pre-receivership conduct was inadmissible under the district court's in limine order, the deputy receiver argues, because it was offered to show that the Bureau's acts or omissions contributed to the demise of Fidelity Bankers. We agree with the deputy receiver that the negligence of the regulator is no defense to an action brought by a receiver. See, e.g., Clark v. Milam , 891 F. Supp. 268, 271-72 (S.D. W.Va. 1995). The receiver assumes the identity of the insolvent insurer, to whom the negligence of the regulator cannot be imputed. See id. However, we do not believe that the evidence of pre-receivership conduct by the Bureau was introduced to show regulatory negligence at all. On the contrary, our review of the entire record

11

reveals that the defendants offered evidence of the Bureau's knowledge and approval of Fidelity Bankers' dealings in order to show that the defendants lacked both intent to defraud and knowledge of insolvency and in order to show that they satisfied their fiduciary duties by acting in good faith. Each of these issues was placed in controversy by the deputy receiver's case-in-chief.

The essence of the deputy receiver's case may be distilled into two propositions. One, the defendants placed Fidelity Bankers in a precarious financial position by selling annuities with high crediting rates and low surrender charges while investing heavily in volatile, high-risk junk bonds. Two, instead of mitigating the riskiness of their strategy, the defendants concealed it through accounting stratagems and nondisclosures that falsely inflated the amount of capital and surplus reported to state regulators. In support of the latter point, the deputy receiver attempted to prove that the defendants caused Fidelity Bankers to falsely inflate its reported capital and surplus by (1) obtaining illusory surplus relief reinsurance in transactions that actually transferred little or no risk from Fidelity Bankers, (2) circumventing the requirement that agent commissions be reported in the year a policy is written by paying the commissions to a third-party subsidiary of First Capital, (3) selling receivables that insurance accounting does not recognize as assets to First Capital for cash and reporting the cash as an asset, and (4) backdating a $20 million surplus note from 1988 to 1987.

In rebuttal, the defendants attempted to show that Fidelity Bankers' product and investment strategies were the result of prudent business decisions, that they had acted in good faith, and that they had concealed nothing. In support of these contentions, the defendants introduced evidence that they had repeatedly and openly disclosed to the Bureau the means by which Fidelity Bankers had been acquired, the reinsurance treaties on which the company relied, and the exact composition of the company's portfolio. The defendants further attempted to show that the Bureau, armed with very much the same information as the defendants, saw no fatal infirmity in Fidelity Bankers until May 1991, shortly before it placed the company in receivership. Similarly, the defendants introduced evidence that other parties, such as Fidelity Bankers' longtime actuary, a bank, a rating agency, an auditor, and a broker, had reviewed identical information and, like the Bureau, had

12

perceived no cause for concern. In fact, those parties had relied on this same information to loan First Capital money, rate Fidelity Bankers highly, certify financial statements, and sell Fidelity Bankers' products. Evidence that Fidelity Bankers appeared to be in good shape to everyone who had a chance to examine the company prior to May 1991 -- including, but not limited to, the Bureau -- was directly relevant to the defendants' arguments that they acted reasonably and in good faith.

Reasonable action is the most obvious defense to the deputy receiver's charge of negligence, and good faith is a defense to at least two of his other counts. See O'Hazza v. Executive Credit Corp., 431 S.E.2d 318, 323 (Va. 1993) (breach of fiduciary duty requires that defendant not have acted in good faith); 15 U.S.C.§ 78t(a) (good faith a defense to liability as a control person under the Securities Exchange Act of 1934). We therefore conclude that the evidence of the Bureau of Insurance's pre-receivership knowledge and approvals of Fidelity Bankers transactions was properly admitted.

B.

The deputy receiver next challenges the admission of evidence concerning (1) the deputy receiver's sale of the junk bonds, (2) the recovery of the junk bond market after May 13, 1991, and (3) the propriety of the Commission's September 29, 1992, order finding Fidelity Bankers insolvent and approving the rehabilitation plan. At trial the defendants attempted to show that notwithstanding a moratorium on payments to policyholders, the deputy receiver rapidly sold off the bulk of Fidelity Bankers' junk bonds at a loss instead of holding those bonds and selling other assets. Not long after the selloff, the junk bond market began to recover. The purpose of this evidence was to establish that the deputy receiver lacked the expertise needed to manage a portfolio as large as Fidelity Bankers' and that it was his improvident sale of the junk bonds, not any wrongful act of the defendants, that proximately caused the damages to Fidelity Bankers, its creditors, and its policyholders. The deputy receiver contends that any such evidence would be inconsistent with the Commission's finding that Fidelity Bankers was insolvent by over $200 million as of May 13, 1991, and the Commission's confirmation of the Plan Dividend as an appropriate measure of damages to policyholders. According to

13

the deputy receiver, the defendants are precluded by principles of collateral estoppel from challenging the Commission's findings and orders.

We are unpersuaded by the deputy receiver's arguments, which reflect a fundamental misunderstanding of preclusion principles. It is an axiom of collateral estoppel, and indeed due process, that the defendants can be bound by the Commission's findings and order only if they were parties, or in privity to a party, to the June 1992 proceeding before the Commission. See Richards v. Jefferson County, 517 U.S. 793, 798 (1996); First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough, 81 F.3d 1310, 1314-15 (4th Cir. 1996); Kesler v. Fentress, 286 S.E.2d 156, 157 (Va. 1982). They were not. None of the defendants appeared before the Commission or otherwise participated in that proceeding. Although First Capital did participate, none of the defendants had any association with First Capital by June of 1992. By then, Weingarten, Ginsberg, and Gubar had resigned their positions with the company, and Shearson had written off its entire $144 million investment.

The deputy receiver nonetheless contends that "[t]o hold that an entity may collaterally attack a receivership proceeding because it was not a party would disrupt the Commission's power to regulate the insurance industry." Deputy Receiver's Reply Br. at 12-13. It is true that "`where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate,'" the usual rule that judgments are binding only on parties and their privies is relaxed somewhat. Richards , 517 U.S. at 799 (quoting Martin v. Wilks, 490 U.S. 755, 762 n.2 (1989)). Thus, so long as such a scheme is otherwise consistent with due process, it may operate to foreclose unsubmitted claims against an estate. See id. This narrow exception to the rule permits the orderly administration of an estate by compelling interested parties to assert their claims or forfeit them. It does not, however, extend so far as to compel every individual against whom the estate may later assert a claim to appear and contest a finding of insolvency in order to preserve a defense to liability in a subsequent action. Cf. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 330 (1979) (noting that offensive use of collateral estoppel may be unfair to a defendant who had little incentive to defend vigorously in the prior action, particularly if future suits are

14

not foreseeable).**6** To hold otherwise would impose unfair burdens on potential defendants. In addition, obligating every potential defendant to participate in and challenge the insolvency proceedings would only undermine their efficiency.

Even if the defendants were not bound by the Commission's September 1992 order, the deputy receiver argues that the district court's pretrial ruling had excluded any evidence that was inconsistent with the Commission's findings. The defendants' use of such evidence at trial and the district court's admission of it, the deputy receiver contends, was unexpected and unfairly prejudicial. We see neither surprise nor prejudice in the admission of the challenged defense evidence. First of all, the district court stated clearly at the hearing on the in limine motions that its pretrial evidentiary rulings were provisional and subject to revision, if necessary, during the trial itself. Second, even if the Plan Dividend approved by the Commission had been a binding measure of the damages suffered by policyholders, the deputy receiver still had to show what portion of those damages, if any, was proximately caused by the wrongful acts of the defendants rather than by his own negligence. Third, the in limine ruling not only excluded evidence that was inconsistent with the Commission's findings, it also admitted (1) evidence of conduct by the deputy receiver offered to show that he contributed to the damages suffered by policyholders and (2) evidence of the junk bond market's recovery and Fidelity Bankers' financial condition after May 13, 1991. The in limine ruling thus made it clear that the contributory negligence of the deputy receiver would be an issue at trial.

_____

**6** For identical reasons we reject the district court's reliance on the Rooker-Feldman doctrine to bar the defendants from introducing evidence inconsistent with the Commission's orders. Under that doctrine "a party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights." Johnson v. De Grandy, 512 U.S. 997, 1005-06 (1994). See also District of Columbia Court of Appeals v. Feldman, 460 U.S. 482 (1983). Rooker-Feldman does not apply, however, when the person asserting the claim in the federal suit was not a party to the state proceeding. See Johnson, 512 U.S. at 1005-06 (1994).

15

We find this last point particularly telling. There is of course some tension between the exclusion of evidence challenging the Commission's finding that Fidelity Bankers was insolvent and the admission of evidence suggesting that the company might have been able to satisfy its obligations if the deputy receiver had not been negligent. Nevertheless, the district court's pretrial ruling gave the deputy receiver notice that the jury would hear evidence about his conduct and the junk bond market's recovery after receivership. The deputy receiver thus was aware that the jury would hear evidence that might call into question the Commission's finding of insolvency. He could not reasonably rely on just so much of the ruling as excluded the evidence he objected to, while ignoring the portions of the ruling that appeared to allow much of that same evidence.

We hold that the defendants were not be bound by findings made by the Commission in a proceeding to which they were not parties and at which they did not appear. We also conclude that the deputy receiver was not unfairly prejudiced by the admission of evidence concerning his own administration of the Fidelity Bankers estate. Consequently, we find no error in the admission of the evidence.[7]

C.

The deputy receiver next argues that the district court erred when, at the close of the defendants' case, it granted the defendants judgment as a matter of law on the deputy receiver's claim for violation of the Virginia Securities Act. The deputy receiver alleged that the defendants, through their control of First Capital, had violated Va. Code Ann. § 13.1-522(B), (C). These provisions impose liability on any person who employs a device, scheme, or artifice to defraud another person through the business of advising others in the purchase or sale of securities.[8] We agree with the deputy receiver that the evi-

_____

[7] The deputy receiver has also appealed the district court's denial of his motion for a new trial. That motion raised the same evidentiary challenges that we have rejected here. Consequently, we affirm the district court's denial of the deputy receiver's motion for a new trial.

[8] The relevant portion of § 13.1-522(B) states:

> Any person who . . . receives, directly or indirectly, any consideration from another person for advice as to the value of securi-

16

dence presented at trial, viewed in the light most favorable to the deputy receiver, see Scheduled Airlines Traffic Offices, Inc. v. Objective, Inc. 180 F.3d 583, 588 (4th Cir. 1999), was sufficient for a jury to have found a violation of the Virginia Securities Act, if barely so. Consequently, it was error for the district court to grant judgment to the defendants on that count. Nevertheless, we find the error harmless because the jury's verdicts in favor of defendants on the remaining counts for fraud and constructive fraud preclude the possibility that the deputy receiver might have prevailed on his remaining claim.

A plaintiff who alleges a violation of § 13.1-522(B)(ii) must show that the defendant employed a "device, scheme, or artifice to defraud" the plaintiff or engaged in some "act, practice or course of business which operates or would operate as a fraud or deceit" on the plaintiff. Va. Code Ann. § 13.1-522(B)(ii). The deputy receiver's evidence of fraud for purposes of the Virginia Securities Act consisted entirely of a number of alleged misrepresentations concerning the soundness of Fidelity Bankers' investment strategy, the market value of its portfolio, First Capital's expertise in giving investment advice, and the relationship between the duration of Fidelity Bankers' investments and its liabilities. This evidence was identical to the evidence he presented in support of his allegations of actual and constructive fraud. The jury, however, found in favor of the defendants on both of the fraud claims. In rejecting the deputy receiver's allegations of fraud and constructive fraud, the jury would, as a matter of logical necessity, have rejected the deputy receiver's allegation that the defendants employed a device, scheme, or artifice to defraud or that they engaged in some act, practice or course of business that operates or would operate as a fraud or deceit. Consequently, the error in awarding the defendants judgment on the state securities law count was harmless.

_____

ties or their purchase or sale, whether through the issuance of analyses, reports or otherwise and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person, shall be liable to that person . . . .

Va. Code Ann. § 13.1-522(B)(ii).

17

D.

For the reasons given above, we hold that the evidence of the Bureau's knowledge and approval of Fidelity Bankers' transactions prior to receivership was properly admitted to show the defendants' good faith, reasonable conduct, lack of scienter, and lack of knowledge of insolvency. The evidence of the deputy receiver's conduct during the receivership was properly admitted to prove the affirmative defense of contributory negligence. Finally, the district court's grant of judgment as a matter of law to the defendants on the deputy receiver's Virginia Securities Act claim, though error, was harmless. We therefore affirm the judgment in favor of the defendants on the deputy receiver's claims.

III.

We turn now to the defendants' cross-appeal. As we have already discussed, the defendants settled a class action brought on behalf of Fidelity Bankers policyholders (and others), alleging fraud, misrepresentation, and violations of federal securities laws. After the deputy receiver filed this action in federal court, the defendants asserted counterclaims for exoneration, indemnification, and contribution arising out of the settlement. The counterclaims were severed before trial. After trial the case was reassigned to Judge Williams, who held that the Commission's order asserting exclusive jurisdiction over claims against Fidelity Bankers was entitled to full faith and credit and divested the federal court of subject matter jurisdiction over the counterclaims. See Weingarten, 18 F. Supp.2d at 618-20. The defendants contend that state courts cannot alter the jurisdiction of the federal courts and urge reversal on that ground. The deputy receiver vigorously defends the judgment of dismissal, but he argues in the alternative that if federal jurisdiction over the counterclaims does exist, abstention is warranted. For the reasons set out below, we hold that the district court did have jurisdiction over the counterclaims and that abstention is not appropriate on the facts of this case. We therefore reverse the dismissal of the counterclaims and remand for further proceedings.

A.

As an initial matter, the counterclaims satisfy the requirements for diversity jurisdiction under 28 U.S.C. § 1332. The deputy receiver is

18

acting on behalf of Fidelity Bankers, a Virginia corporation. The defendants (and counterclaimants) are all of diverse citizenship: Weingarten and Ginsberg are citizens of California, Gubar is a citizen of New York, and Shearson is a Delaware corporation with its principal place of business in New York. The amount in controversy is in excess of $75,000. In addition to having diversity jurisdiction, the district court had supplemental jurisdiction under 28 U.S.C. § 1367(a) because the counterclaims are so related to the deputy receiver's claims that they form part of the same Article III case or controversy. Nevertheless, the deputy receiver contends that Virginia's insurance statutes grant the Commission jurisdiction to resolve all claims against an insolvent insurer's estate and that the Commission's order asserting exclusive jurisdiction is binding on all other courts. We disagree.

"In determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not to the acts of states which have no power to enlarge or contract the federal jurisdiction." Markham v. City of Newport News, 292 F.2d 711, 713 (4th Cir. 1961). The Supreme Court has repeatedly and unequivocally rejected the deputy receiver's contention that a state may oust the federal courts of jurisdiction by creating an exclusive forum for claims against an estate. As early as 1857 the Court noted that it had "repeatedly decided that the jurisdiction of the courts of the United States over controversies between citizens of different States cannot be impaired by the laws of the States, which prescribe the modes of redress in their courts, or which regulate the distribution of their judicial power." Hyde v. Stone, 61 U.S. (20 How.) 170, 175 (1857). See also Clark v. Bever, 139 U.S. 96, 102 (1891) (rejecting argument that a state could, "by legislative enactment conferring upon its own courts exclusive jurisdiction of all proceedings or suits involving the settlement and distribution of the estates of deceased persons, . . . exclude the jurisdiction of the courts of the United States even in cases where the constitutional requirement as to citizenship is met"); Green's Adm'x v. Creighton, 64 U.S. (23 How.) 90, 107-08 (1859) (holding that a creditor of diverse citizenship "may establish his debt in the courts of the United States against the representatives of a decedent, notwithstanding the local laws relative to the administration and settlement of insolvent estates"). The existence of federal jurisdiction is in no way affected by the potential for inconvenience to the deputy

19

receiver. See Hess v. Reynolds, 113 U.S. 73, 77 (1885) ("[N]either the principle of convenience nor the statutes of a State can deprive [the courts of the United States] of jurisdiction to hear and determine a controversy between citizens of different states when such a controversy is distinctly presented, because the judgment may affect the administration or distribution in another forum of the assets of the decedent's estate.").

An attempt to restrain the exercise of federal jurisdiction is no more effective when made by a court in the form of an injunction. "[S]tate courts are completely without power to restrain federal-court proceedings in in personam actions . . . ." Donovan v. City of Dallas, 377 U.S. 408, 412-13 (1964). See also Baker v. General Motors Corp., 522 U.S. 222, 236 n.9 (1998) ("This court has held it impermissible for a state court to enjoin a party from proceeding in a federal court . . . ." (citing Donovan)). There is a necessary corollary to this rule for in rem and quasi in rem actions: "the court first assuming jurisdiction over property may maintain and exercise that jurisdiction to the exclusion of the other" court. Princess Lida of Thurn and Taxis v. Thompson, 305 U.S. 456, 466 (1939). However, even if the initial state action is in rem or quasi in rem, there is no bar to jurisdiction in federal court in a case "based upon diversity of citizenship, wherein the plaintiff seeks merely an adjudication of his right or his interest as a basis of a claim against a fund in the possession of a state court." Id. There is no danger of conflict in such cases because the "establishment of the existence and amount of a claim against the debtor in no way disturbs the possession of the liquidation court, in no way affects title to the property, and does not necessarily involve a determination of what priority the claim should have." Morris v. Jones, 329 U.S. 545, 549 (1947). See also Kline v. Burke Constr. Co., 260 U.S. 226, 230-31 (1922); Williams v. Benedict, 49 U.S. (8 How.) 107, 112 (1850). Here the defendants seek only to establish their rights to exoneration, contribution, or indemnification. If they are permitted to proceed in federal court and they succeed on those claims, they would still be required to present their judgments to the Virginia Commission. The Commission would then direct the deputy receiver to pay those judgments in accordance with the rehabilitation plan and Virginia's statutes governing the priority of claims, Va. Code Ann. §§ 38.2-1509, 38.2-1514.

20

The deputy receiver suggests, however, that this analysis is altered by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011 et seq., which declares that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, . . . unless such Act specifically relates to the business of insurance." 15 U.S.C.§ 1012(b). "The McCarran-Ferguson Act thus precludes application of a federal statute in face of state law `enacted . . . for the purpose of regulating the business of insurance,' if the federal measure does not`specifically relat[e] to the business of insurance,' and would `invalidate, impair, or supersede' the State's law." Humana, Inc. v. Forsyth, 525 U.S. 299, 307 (1999). The deputy receiver argues that Va. Code Ann. § 38.2-1508, which confers on the Commission jurisdiction over "[a]ll further proceedings in connection with the rehabilitation or liquidation" of an insolvent insurer, establishes an exclusive state court forum for the defendants' counterclaims. Implicit in this argument is the assertion that federal jurisdiction would "invalidate, impair, or supersede" Virginia law by providing an alternative forum for those claims. See Weingarten, 18 F. Supp.2d at 618.

We are skeptical that Congress intended, through the McCarran-Ferguson Act, to remove federal jurisdiction over every claim that might be asserted against an insurer in state insolvency proceedings. See Munich American Reins. Co. v. Crawford, 141 F.3d 585, 595 (5th Cir.), cert. denied sub nom. American Reins. Co. v. Crawford, 525 U.S. 1016 (1998); Martin Ins. Agency v. Prudential Reins. Co., 910 F.2d 249, 254 (5th Cir. 1990). If nothing else, the argument proves too much, for it would operate to divest exclusively federal jurisdiction as effectively as it would diversity jurisdiction, leaving many plaintiffs with no forum in which to assert their federal rights. In any event, we do not believe that concurrent federal jurisdiction over the defendants' counterclaims threatens to "invalidate, impair, or supersede" (as those terms are used in the McCarran-Ferguson Act) Virginia's efforts to establish a single equitable proceeding to liquidate or rehabilitate insolvent insurers. See Humana, 525 U.S. at 307-10 (defining "impair"). As we have already noted, the Commission has had exclusive jurisdiction of the property of Fidelity Bankers -- the res -- since May 13, 1991. And, as we have also emphasized, the defendants would still have to present claims to the Commission in order to recover on any judgment in their favor. The claims based on

21

that judgment would be satisfied subject to the terms of the rehabilitation plan and the priorities established by Virginia law. Thus, the state forum retains exclusive jurisdiction over the liquidation of Fidelity Bankers and the disposition of its assets.

We realize that in some limited circumstances, the exercise of federal diversity jurisdiction might in fact impair state laws establishing exclusive claims proceedings for insurance insolvencies. This potential for conflict, however, is already contemplated in the principles governing the exercise of jurisdiction, which provide a safety valve through the pragmatic doctrine of abstention. Abstention gives federal courts the flexibility to avoid exercising jurisdiction when doing so would be "disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." New Orleans Public Serv., Inc. v. Council of New Orleans, 491 U.S. 350, 361 (1989) (NOPSI). See also Johnson v. Collins Entertainment Co., 199 F.3d 710, 718-19, 725 (4th Cir. 1999). Although"abstention from the exercise of federal jurisdiction is the exception, not the rule," Colorado River Water Conservation Dist. v. United States , 424 U.S. 800, 813 (1976), there are narrow classes of cases implicating particularly local issues in which abstention will more frequently be appropriate. See Johnson, 199 F.3d at 720-22. Insurance regulation has long been recognized as an area of traditional state concern, so "there are a large number of cases where federal courts have abstained lest they upset ongoing state insolvency proceedings." Hartford Cas. Ins. Co. v. Borg-Warner Corp., 913 F.2d 419, 426 (7th Cir. 1990). See also Lac D'Amiante du Quebec, Ltee. v. American Home Assurance Co., 864 F.2d 1033, 1048 (3d Cir. 1988) (collecting such cases). Where the exercise of federal jurisdiction would in fact "invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance," 15 U.S.C. § 1012(b), abstention would be warranted. Thus, the abstention doctrine's goal of preventing "needless conflict with state policy," Burford v. Sun Oil Co., 319 U.S. 315, 327 (1943), maps neatly onto the McCarran-Ferguson Act's purpose of preventing impairment of state insurance regulation.

We hold that the Commission's order purporting to assert sole and exclusive jurisdiction over all claims against Fidelity Bankers could not and did not divest the federal courts of the jurisdiction conferred upon them by Congress. Furthermore, we hold that Va. Code Ann.

22

§ 32.1-1508, in conjunction with the McCarran-Ferguson Act, does not preempt federal jurisdiction over the defendants' counterclaims. Abstention needs further discussion.

B.

As we have just discussed, federal courts frequently have relied on the abstention doctrine to avoid disruption of state insurance insolvency proceedings. Accordingly, the deputy receiver urges an abstention-based dismissal of the counterclaims here. We find, however, that dismissal on abstention grounds is inappropriate on the facts of this case. Weingarten's, Ginsberg's, and Gubar's legal claims for money damages cannot be dismissed under the equitable doctrine of abstention, and Shearson has asserted a claim that is subject to exclusively federal jurisdiction. Moreover, the exercise of federal jurisdiction over the defendants' routine counterclaims presents none of the risk of interference in state law or policy that would normally justify abstention.

Weingarten, Ginsberg, and Gubar claim that they are entitled to relief on any one of four theories: (1) equitable indemnification, (2) contractual and statutory indemnification, (3) exoneration, or (4) contribution. The second of these theories presents a claim for money damages at law. Weingarten, Ginsberg, and Gubar allege that under Fidelity Bankers' bylaws, they are contractually entitled to indemnification to the full extent permitted by Virginia law. Virginia Code Ann. §§ 13.1-697 provides for the indemnification of a director who incurs liability as a result of his actions as a director under certain circumstances. If the elements of the indemnification provision are satisfied, the district court would have no discretion to deny relief to the defendants on their legal claim for indemnification. The Supreme Court has recently made clear that a district court may abstain from exercising its jurisdiction and dismiss a case under Burford "only where the relief being sought is equitable or otherwise discretionary." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 731 (1996). Consequently, dismissal of the individual defendants' legal counterclaims under Burford would be inappropriate.

Shearson argues that it is asserting a right to contribution in part for its settlement of class action claims asserting violations of section

23

10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. According to Shearson, this contribution claim is subject to exclusively federal jurisdiction. As a result, Shearson argues, the state court would be unable to hear this claim and abstention would be improper. We agree. The Supreme Court has held that those charged with liability in a 10b-5 action have a federal right to contribution against other parties who have joint responsibility for the violation. See Musick, Peeler & Garrett v. Employees Ins. of Wausau, 508 U.S. 286, 298 (1993). A direct action alleging violations of section 10(b) and Rule 10b-5 is subject to exclusively federal jurisdiction. See 15 U.S.C. § 78aa ("The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter [tit. 15, ch. 2B] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder."). A 10b-5 contribution claim, just like a direct 10b-5 claim, alleges a violation of the regulations promulgated under Title 15, chapter 2B, and therefore is subject to exclusively federal jurisdiction under 15 U.S.C. § 78aa. It would be improper to abstain from exercising that exclusively federal jurisdiction. "Where a state court lacks jurisdiction over a plaintiff's claim, Burford abstention is clearly inappropriate because there can be no opportunity for timely and adequate state court review of a claim that a court has no power to decide." Riley v. Simmons, 45 F.3d 764, 773 (3d Cir. 1995). Thus, we hold that under Burford abstention the district court could not dismiss Shearson's claim for contribution under section 10(b) and Rule 10b-5.

Finally, although a federal court may not dismiss a legal claim for money damages on abstention grounds, the Supreme Court has left open the possibility of a stay. See Quackenbush , 517 U.S. at 721. However, we do not believe that a stay is warranted in this case. The defendants' claims do not involve the "extraordinary circumstances" required to justify abstention. Id. at 726. First, they do not present "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case at bar." NOPSI, 491 U.S. at 361. The individual defendants' claims are routine contribution and indemnification claims whose significance is entirely limited to this case. See Quackenbush, 517 U.S. at 729 (describing defendant's claim for setoff against insolvent

24

insurer as "a run-of-the-mill contract dispute"). Shearson's counterclaim for contribution under 10b-5 implicates no state law question at all. Indeed, a stay of Shearson's claim would serve no purpose but delay because that claim ultimately must be decided by a federal court. Second, adjudication of the defendants' counterclaims in federal court would not "be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." NOPSI, 491 U.S. at 361. As we have observed above, see part III.A., exercise of federal jurisdiction in this case will not disturb the Commission's exclusive jurisdiction over the property and the liquidation of Fidelity Bankers. Assuming the defendants' counterclaims are successful, any judgment obtained would still be subject to the Commission's rehabilitation plan and Virginia's statutes governing the priority of claims. And while we are mindful of the general desirability of resolving all claims in a single forum, the Virginia receivership regime itself recognizes the need to pursue claims before other courts and gives the receiver the authority to do so. Once the deputy receiver forsakes the advantages of the single state forum in order to proceed in federal court, as he has done here, exercise of federal jurisdiction over the defendants' counterclaims does not hinder Virginia's statutory goal of a single, exclusive proceeding.

For the reasons stated above, we hold that a dismissal based on Burford abstention is inappropriate for Weingarten's, Ginsberg's, and Gubar's claims for contractual and statutory indemnification. Dismissal on abstention grounds is also inappropriate for Shearson's claim for contribution, insofar as it is based on an allegation that Fidelity Bankers is liable for a violation of § 10(b) and Rule 10b-5. We also hold that a stay of the defendants' counterclaims is not warranted because exercise of federal jurisdiction neither requires that a federal court pass on difficult or novel questions of state law nor threatens to disrupt state efforts to establish a coherent scheme with respect to the liquidation and administration of insolvent insurance companies.

C.

We have held that the district court had jurisdiction over all of the defendants' counterclaims and that abstention was not warranted on the individual defendants' claims for indemnification or Shearson's

25

claim for contribution under § 10(b) and Rule 10b-5. As a result, we reverse the judgment dismissing the defendants' counterclaims.

IV.

For the reasons stated in part II, we hold that the evidence of Bureau and deputy receiver conduct was properly admitted at trial. We also hold that the district court's judgment as a matter of law for the defendants on the Virginia Securities Act claim was harmless error. Consequently, we affirm the judgment in favor of the defendants on the deputy receiver's claims. For the reasons stated in part III, we hold that the district court had jurisdiction over the defendants' counterclaims and that abstention would be inappropriate. We therefore reverse the district court's dismissal of the counterclaims and remand for further proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

26