RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0267p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

WILLIAM POWELL COMPANY,

*Plaintiff-Appellee*,

v.

NATIONAL INDEMNITY COMPANY, et al.,

*Defendants*,

ONEBEACON INSURANCE COMPANY,

*Defendant-Appellant*.

No. 20-3737

───────────────

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:14-cv-00807—Susan J. Dlott, District Judge.

Argued: March 3, 2021

Decided and Filed: November 18, 2021

Before: WHITE, LARSEN, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Richard M. Garner, COLLINS, ROCHE, UTLEY, & GARNER, LLC, Dublin, Ohio, for Appellant. David F. Hine, VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Richard M. Garner, Sunny Lane Horacek, COLLINS, ROCHE, UTLEY, & GARNER, LLC, Dublin, Ohio, for Appellant. David F. Hine, Nathaniel Lampley, Jr., Joseph M. Brunner, VORYS, SATER, SEYMOUR AND PEASE LLP, Cincinnati, Ohio, for Appellee.

NALBANDIAN, J., delivered the opinion of the court in which LARSEN, J., joined, and WHITE, J., joined in part. WHITE, J. (pp. 25–31), delivered a separate opinion concurring in part and dissenting in part.

_____

**OPINION**

_____

NALBANDIAN, Circuit Judge.  If at first you don't succeed, try, try again.  OneBeacon Insurance takes this advice to heart.  It has tried repeatedly, both before us and before the district court, to get rid of William Powell Company's (WPC) federal lawsuit against it.  And up until now, those efforts have failed.  But this time, OneBeacon comes armed with a new weapon: a final, state-court judgment.  It says that this judgment precludes WPC's federal lawsuit.

The district court disagreed.  Though the court believed that the state judgment likely satisfied the elements of claim preclusion, the court also felt it would be unjust to bar WPC's suit because it had allowed the federal case to proceed in tandem with the state case for several years.  At the same time, the court recognized that this case was appropriate for interlocutory appeal.  *See* 28 U.S.C. § 1292(b).  And so it certified its order denying OneBeacon's motion to dismiss for us to review.  We granted permission for the appeal, and we now **REVERSE** the district court's judgment and **REMAND** the case for proceedings consistent with this opinion.

I.

The roots of this litigation go back to the 1950s.  From 1955 until 1976, WPC, a manufacturer of industrial valves, bought thirteen primary and excess level liability insurance policies from OneBeacon's predecessor.  And good thing, too.  In 2001, lawsuits started coming against WPC.  The plaintiffs in those suits claimed they were exposed to asbestos in WPC's valves.

Facing these lawsuits, WPC tendered claims for indemnity and defense to OneBeacon, its insurer.  The two agreed on the terms and limits of WPC's coverage, and OneBeacon began its defense.  But early cooperation quickly broke down.  The parties reached an impasse over several issues, kicking off this labyrinthian litigation.  WPC first sued OneBeacon in Ohio state court for declaratory relief.  It asked the court to answer several questions: whether aggregate limits in WPC's policies were annual, what those aggregate limits were, whether WPC had the right to allocate settlement sums expended on its behalf, and whether OneBeacon had to pay

100% of defense and indemnity costs from claims triggering coverage under WPC's excess policies.

After some procedural jockeying, the state trial court granted WPC summary judgment on all issues except those relating to allocation and the excess policies. Those were not yet ripe for review.

While all this was happening, WPC also sued OneBeacon (and others) in federal court. This time, it alleged OneBeacon breached the general insurance agreements by denying WPC coverage and failing to defend it against asbestos litigation. WPC also alleged OneBeacon breached its duty of good faith and fair dealing in its handling, processing, payment, and satisfaction of WPC's asbestos-related insurance claims. According to WPC, OneBeacon conducted limited investigation into the lawsuits against WPC, delayed communication of coverage decisions, made unilateral litigation decisions, and refused to fund settlements or pay local defense counsel. So by "forcing [WPC] to bear indemnity and defense costs that were not [WPC's] responsibility," OneBeacon acted in bad faith. (R. 1, Compl., PageID # 21.)

All the defendants in the federal case successfully moved to dismiss WPC's complaint except OneBeacon. But that was not for lack of trying. After WPC filed the complaint, OneBeacon moved to dismiss or stay the case. It argued that abstention principles disfavored federal adjudication.

This effort failed. The district court rejected OneBeacon's argument that the federal and state proceedings were parallel, so it denied OneBeacon's motion to dismiss. Undeterred, OneBeacon tried to appeal and moved the district court to reconsider. Those efforts also failed.

Remember, this federal litigation was going on while the state suit remained pending. And in 2017, after filing its federal complaint, WPC amended its state complaint to reallege the issues the trial court previously said were not yet ripe. But this time, WPC did not seek a declaratory judgment. Instead, it brought two claims for breach of contract. In the first, WPC said OneBeacon breached its general accident policies by unilaterally allocating claim payments among policies against WPC's wishes. And in the second, WPC claimed OneBeacon breached the excess policies by refusing to pay all of WPC's indemnity and defense costs.

The state court resolved these claims.  It held that WPC had the right to direct allocation of claims among policies.  But it also held that OneBeacon had not committed either of the breaches that WPC alleged.  That was because OneBeacon's excess policies were not yet triggered, so there were no policies to which WPC could direct the allocation of funds.  And for this same reason, OneBeacon did not have to pay WPC's indemnity and defense costs from its excess policies.  Instead, WPC owed OneBeacon more than $11 million for OneBeacon's overpayments.

With this victory in hand, OneBeacon again moved to dismiss WPC's federal lawsuit. Having won a final judgment, OneBeacon argued that the trial court's ruling precluded WPC's federal claims.  And it also argued that *Colorado River* abstention was appropriate.  *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

This time, the district court agreed with OneBeacon, but only partially.  The court acknowledged that the state court judgment likely satisfied the elements of claim preclusion, but it declined to dismiss the case.  Instead, the court allowed it to survive, citing the Restatement (Second) of Judgments § 26(1)(f).  Still, the court stayed the case, noting that WPC's second amended complaint in the state court action made the state and federal proceedings parallel.  *See Colo. River*, 424 U.S. at 817.

Unsatisfied with this ruling, OneBeacon successfully moved the court to certify for appeal its interlocutory order denying the motion to dismiss.  *See* 28 U.S.C. § 1292(b).  And we agreed to hear the appeal.  *In re OneBeacon Ins. Co.*, No. 19-0309, 2020 U.S. App. LEXIS 21780, at *1–3 (6th Cir. July 13, 2020) (order); *see* 28 U.S.C. § 1292(b).

One last thing.  After OneBeacon filed its notice of appeal here, the Ohio Court of Appeals reviewed the state court's order—the one OneBeacon hopes has preclusive effect.  *See William Powell Co. v. OneBeacon Ins. Co.*, 162 N.E.3d 927 (Ohio Ct. App. 2020).  And it affirmed in part and reversed in part.  *Id.* at 947.  Affirming, the Court of Appeals agreed that WPC had the right to allocate claim proceeds.  *Id.* at 946–47.  But partially reversing, the Court of Appeals said that some of WPC's excess policies had been triggered and that OneBeacon breached these policies by not paying all of WPC's defense costs.  *Id.* at 943–44.  In other words,

OneBeacon breached *some*, but not all, of the excess policies. *Id.* The court also reversed the trial court's holding that OneBeacon was entitled to contribution from WPC. *Id.* at 945. When all was said and done, the court remanded the case to the trial court to calculate damages for WPC. *Id.* at 947.

OneBeacon appealed the Court of Appeals' decision to the Ohio Supreme Court, which declined to review the case. *See William Powell Co. v. OneBeacon Ins. Co.*, 164 N.E.3d 840 (Ohio 2021) (table).

## II.

If all that procedural history were not complicated enough, things get trickier still. After the parties briefed and argued this case, Pennsylvania liquidated OneBeacon. As part of its liquidation order, the state liquidator stayed all litigation against OneBeacon—whether in Pennsylvania or elsewhere. And the language of that order, in theory, included this case. So we were left with the difficult question of whether the stay binds us.

We asked the parties to submit supplemental briefing on the questions the stay order raised. Thus, we asked whether the McCarran-Ferguson Act, 15 U.S.C. § 1012(b), "reverse preempts" the federal diversity jurisdiction statute, 28 U.S.C. § 1332. We also asked the parties to brief whether abstention under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), was appropriate. And finally, we asked whether an Ohio state court would respect Pennsylvania's stay on litigation, and whether a federal court deciding Ohio state-law claims must do the same. The parties submitted helpful briefs. In the end, we resolve this appeal despite the state stay order. We address the relevant questions in turn.

## A.

We start with the easiest question: Does the McCarran-Ferguson Act "reverse preempt" the federal diversity jurisdiction statute, 28 U.S.C. § 1332? The answer is no. Neither does the Act preclude our appellate jurisdiction under 28 U.S.C. § 1292(b). As a general rule, of course, "state courts are completely without power to restrain federal-court proceedings in *in personam*

actions." *Donovan v. City of Dallas*, 377 U.S. 408, 413 (1964). The only question is if the McCarran-Ferguson Act alters this rule here. It does not.

The McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). Congress enacted it "for the specific purpose of consigning to the States broad and primary responsibility for regulating the insurance industry." *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998); *see SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 458 (1969). The Act is potentially relevant here because, the argument might go, the federal jurisdictional statutes could "impair" Pennsylvania's insurance liquidation scheme by allowing federal courts to adjudicate insurance-related lawsuits involving an insolvent insurer. *See, e.g.*, *Grimes v. Crown Life Ins. Co.*, 857 F.2d 699, 702 (10th Cir. 1988). And Congress, by passing the Act, expressed its interest in "leaving insurance regulation to the states." *Id.*

This issue need not detain us long. Several of our sister circuits have addressed this issue and held that the McCarran-Ferguson Act does not reverse-preempt § 1332. *See id.*; *Hawthorne Sav. F.S.B. v. Reliance Ins. Co. of Ill.*, 421 F.3d 835, 843–44 (9th Cir. 2005); *Gross v. Weingarten*, 217 F.3d 208, 223 (4th Cir. 2000); *Munich Am. Reinsurance Co.*, 141 F.3d at 595; *see also Murff v. Pro. Med. Ins. Co.*, 97 F.3d 289, 293 (8th Cir. 1996) (same for other jurisdictional statutes).

Likewise, our own precedent suggests a similar result. *See Dykhouse v. Corp. Risk Mgmt. Corp.*, 961 F.2d 1576, 1992 WL 97952, at *2 n.9 (6th Cir. 1992) (per curiam) ("Although the McCarran–Ferguson Act indicated Congress's intent to leave regulation of the insurance business largely to the states, there is no indication that Congress thereby intended to divest the federal courts of jurisdiction over state insurance claims. Courts repeatedly have held that federal courts do have jurisdiction over these claims."); *Atkins v. CGI Techs. & Sols., Inc.*, 724 F. App'x 383, 388 (6th Cir. 2018) ("Moreover, the district court's jurisdictional ruling, rejecting the Liquidator's argument that Kentucky's [insurance liquidation statute] reverse-preempted the federal diversity jurisdiction statute, is consonant with Sixth Circuit law and the majority view among the circuits.").

To our knowledge, every circuit to address the question has held that the McCarran-Ferguson Act does not reverse-preempt the federal diversity jurisdiction statute. We join that chorus and hold that the McCarran-Ferguson Act does not reverse-preempt the jurisdictional statutes at issue. Applying those provisions will "not frustrate any declared state policy or interfere with [Pennsylvania]'s administrative regime," *Humana Inc. v. Forsyth*, 525 U.S. 299, 310 (1999), as "[t]he state forum here, that of Pennsylvania, retains exclusive jurisdiction over the liquidation of [OneBeacon] and the disposition of its assets," *Hawthorne*, 421 F.3d at 843; *see Gross*, 217 F.3d at 222. Indeed, as we explain below, resolving this particular[1] interlocutory appeal has no chance of diminishing or otherwise affecting "the assets of the insurance compan[y] [that] are up for grabs" in the liquidation proceeding. *AmSouth Bank v. Dale*, 386 F.3d 763, 783 (6th Cir. 2004). Even if we ruled in WPC's favor on the claim preclusion issue, this case would continue in the district court.

Likewise, even if WPC could secure a favorable judgment for damages down the road, it "would still have to present claims to the [liquidator] in order to recover on [that] judgment." *Gross*, 217 F.3d at 222. "The claims based on that judgment would be satisfied subject to the terms of the [liquidation] plan and the priorities established by [Pennsylvania] law," just as if they had been made in the liquidation proceeding itself. *Id.*; *see Hawthorne*, 421 F.3d at 842–43; *cf.* 40 Pa. Cons. Stat. §§ 221.37, 221.38(c), 221.44.

In short, exercising our appellate jurisdiction here will in no way "hinder [the] operation" of Pennsylvania's claims process and priority scheme. *Humana*, 525 U.S. at 311. So because the jurisdictional laws at issue "could not possibly impair the Pennsylvania liquidation proceedings," the McCarran-Ferguson Act does not reverse-preempt our jurisdiction. *Hawthorne*, 421 F.3d at 843.

---

[1]We do not foreclose the possibility that there could be "some limited circumstances" when deciding an appeal "might in fact impair state laws establishing exclusive claims proceedings for insurance insolvencies." *Gross*, 217 F.3d at 222. But if that possibility exists, we can handle it, when appropriate, through abstention. *See AmSouth*, 386 F.3d at 783; *see also Gross*, 217 F.3d at 222; *Murff*, 97 F.3d at 293; *Martin Ins. Agency, Inc. v. Prudential Reinsurance Co.*, 910 F.2d 249, 254 (5th Cir. 1990).

B.

The next question we address is whether abstention is appropriate under *Burford v. Sun Oil Co.*, 319 U.S. at 315, which "has become the doctrine of choice in analyzing whether to abstain in favor of state insurance liquidation and rehabilitation proceedings." *Prop. & Cas. Ins. v. Cent. Nat'l Ins. Co. of Omaha*, 936 F.2d 319, 321 (7th Cir. 1991).[2]

We start with a fundamental principle: "Jurisdiction, if properly conferred, is meant to be exercised." *Id.* at 320–21. Indeed, our obligation to exercise jurisdiction over the cases properly before us is "virtually unflagging." *Colo. River*, 424 U.S. at 813. "When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction." *Willcox v. Consol. Gas Co.*, 212 U.S. 19, 40 (1909).

Despite these principles, the Supreme Court has identified a narrow exception to this general rule. When the exercise of federal jurisdiction is so disruptive of state efforts to establish a coherent, unified regulatory policy over a subject of weighty enough importance to the state, the federal court should decline to decide the case. *See Burford*, 319 U.S. at 334. This is known as *Burford* abstention. *Burford* established a discretionary rule of federal abstention that reflects "principles of federalism and comity." *Cleveland Hous. Renewal Project v. Deutsche Bank Tr. Co.*, 621 F.3d 554, 562 (6th Cir. 2010). The case itself involved a challenge to the reasonableness of the Texas Railroad Commission's decision to grant an oil drilling permit. *Burford*, 319 U.S. at 317. The only question was whether the Commission properly applied the state's oil and gas regulations. *See NOPSI v. Council of New Orleans*, 491 U.S. 350, 360 (1989) (describing the facts of *Burford*). But because this was a question of only "minimal federal importance," *id.*, the Supreme Court held that "a sound respect for the independence of state action" and the need to avoid disrupting Texas's "unified method for the formation of policy" required the district court to "stay its hand." *Burford*, 319 U.S. at 333–34.

---

[2]At the outset we clarify that abstention can encapsulate a few different actions, ranging from dismissing the case, remanding it, or staying its resolution. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 721 (1996). But because this is a common-law case for damages and not a case for equitable relief, dismissal and remand are unavailable to us. *See id.* ("[W]hile we have held that federal courts may stay actions for damages based on abstention principles, we have not held that those principles support the outright dismissal or remand of damages actions."). So all that remains is a stay.

The Court has revisited *Burford* in depth only a few times since first deciding it. And in general, the Court has scaled back the doctrine's reach. *NOPSI* is one example. There, the Court cabined *Burford* to two situations. One, "when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result'" in the case. 491 U.S. at 361 (quoting *Colo. River*, 424 U.S. at 814). And two, "where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *Id.* (quoting *Colo. River*, 424 U.S. at 814). In the end, federal adjudication of the claim in *NOPSI* "would not disrupt the State's attempt to ensure uniformity in the treatment of an 'essentially local problem,'" so the district court had a duty to exercise its jurisdiction. *Id.* at 362 (quoting *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 347 (1951)).

The Court put more gloss on *Burford* in *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 723 (1996). There it instructed federal courts resolving *Burford* questions to balance the state and federal interests at stake. *See id.* at 728. But it cautioned that "[t]his balance only rarely favors abstention." *Id.*

This case is no exception. To start, we have a "strong federal interest" in exercising our jurisdiction. *Id.* And Pennsylvania has only an attenuated interest at stake here. Remember, we are applying *Ohio's* substantive law, not Pennsylvania's. *See Tucker v. First Md. Sav. & Loan, Inc.*, 942 F.2d 1401, 1407 (9th Cir. 1991) ("*Burford* abstention is designed to limit federal interference with the development of state policy. It is justified where the issues sought to be adjudicated in federal court are primarily questions regarding *that state's* laws." (emphasis added)). *Burford* was not a case when resolving one state's law was said to interfere with a *different* state's regulatory interests. *See Hawthorne*, 421 F.3d at 845. And if we stayed this litigation and required WPC and OneBeacon to hash out their differences before the liquidator, we would invite a Pennsylvania liquidator to decide questions of Ohio law. That makes little sense. *See Prop. & Cas. Ins*, 936 F.2d at 322 n.5. So right from the get-go we are disinclined to stay our hand here.

We also note that this case does not satisfy either of the two main reasons *NOPSI* articulated that justify abstention. We are not being asked to *review* a state's action. *See NOPSI*, 491 U.S. at 361; *see also Fragoso v. Lopez*, 991 F.2d 878, 883 (1st Cir. 1993) ("*Burford* abstention is implicated when the federal courts are asked to interfere with state processes by *reviewing* the proceedings or orders of state administrative agencies."). Query whether Pennsylvania's liquidation scheme even "creates a state administrative agency, as opposed to a judicial structure, to which deference under *Burford* may be paid." *Fragoso*, 991 F.2d at 883 (footnote omitted).

Either way, staying our hand here would do nothing to "protect[] complex state administrative processes from undue federal interference" or disruption. *NOPSI*, 491 U.S. at 362. That's because we are not being asked to intervene in OneBeacon's liquidation or resolve questions of Pennsylvania insurance law. *See Hawthorne*, 421 F.3d at 848. Instead, we are being asked to resolve a narrow question of *Ohio* substantive claim preclusion law—a task we are more than up to, especially given that we received the parties' briefing and heard argument before Pennsylvania liquidated OneBeacon. *See Fragoso*, 991 F.2d at 883 (declining to abstain when "[t]he action merely entail[ed] the application of a Puerto Rico statute of limitations, frequently interpreted in the past, to an idiocratic [sic] set of facts"). Indeed, it is important to frame where things are here: this is an interlocutory appeal of a denial of a motion to dismiss. Either we reverse, dismissing the claim against the liquidated entity and thus *furthering* the liquidator's interests, or we affirm, and the case returns to the district court, which may consider anew whether to stay the lawsuit. So our resolution of *this appeal* has little prospect of disrupting Pennsylvania's liquidation scheme. *See AmSouth Bank*, 386 F.3d at 783 ("[I]t is difficult to see how a federal court's pronouncement on issues of common-law liability having nothing to do with insurance could be disruptive of those proceedings.").

We recognize that our sister circuits have come to different conclusions in similar cases. *Hawthorne*, 421 F.3d at 835, presented facts like ours, but so did *Lac D'Amiante du Quebec, Ltee v. American Home Assurance Co.*, 864 F.2d 1033 (3d Cir. 1988), and the two came to

opposite conclusions: one thought abstention was appropriate, the other did not.**3**  But even *Lac D'Amiante* recognized that "[t]he decision as to whether abstention is appropriate may require an inquiry into the facts of the specific case before the court."  864 F.2d at 1047.  And unlike there, the liquidation proceedings here commenced after briefing and oral argument.  So OneBeacon will not "ha[ve] to dissipate its funds" any further to litigate this appeal.  *Id.* at 1045; *see also Fragoso*, 991 F.2d at 882, 885.  Moreover, given the subject-matter of this appeal—Ohio claim preclusion—and the subject-matter of this lawsuit—Ohio breach of contract and bad faith— resolving the issues before us will not significantly intrude into Pennsylvania's liquidation scheme.  *See Quackenbush*, 517 U.S. at 729; *see also Grode v. Mut. Fire, Marine & Inland Ins.*, 8 F.3d 953, 959 (3d Cir. 1993).  At its most disruptive, our resolution of this appeal sends the case back to the district court, which itself can stay the suit.  And even if the district court declines to abstain—a non-issue given our holding on the merits—and WPC then wins this lawsuit, it would simply have to go before the liquidator and present its claim.  *See Gross*, 217 F.3d at 221–22.  That hardly entails substantial disruption.  *See Fragoso*, 991 F.2d at 884 ("Deciding appeals like Fragoso's, which will have at most an indirect effect on the liquidator's claims process by potentially giving rise to an additional claim against the insolvent insurance company, will neither discombobulate local proceedings nor frustrate the Commonwealth's regulatory system.").

Thus, that Pennsylvania has a local process for handling claims against liquidated insurers does not mean we must abstain.  *See NOPSI*, 491 U.S. at 362 ("While *Burford* is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process.").  Abstention is the exception—and an exceedingly narrow one at that—not the rule.  *Id.* at 359.  *Burford* and its progeny do not compel us to stay our resolution of this appeal.

---

**3**A similar trend bears out on broader review of the existing caselaw.  For a small sample, compare *Prop. & Cas. Ins.*, 936 F.2d at 326 (not abstaining), *Fragoso*, 991 F.2d at 884–85 (same), and *Gross*, 217 F.3d at 223–25 (same), with *Clark v. Fitzgibbons*, 105 F.3d 1049, 1051–52 (5th Cir. 1997) (abstaining), *Martin Ins. Agency*, 910 F.2d at 255 (same), and *Grimes*, 857 F.2d at 704 (same and collecting cases).

C.

We have one last piece of business before we can look to the merits of OneBeacon's appeal. We must determine whether the Rules Decision Act, 28 U.S.C. § 1652, together with the *Erie* doctrine, *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), compels us to respect the Pennsylvania stay because that is what an Ohio state court would do.[4]

This issue comes with two questions. The first is whether an Ohio state court would recognize Pennsylvania's stay. We think the answer is yes. The harder question is the second one: because an Ohio state court would respect the stay, must we? We begin with the first question.

Ohio is one of many states to have passed a uniform insurance liquidation act, known in Ohio as the Insurers Supervision, Rehabilitation, and Liquidation Act. *See* Ohio Rev. Code. § 3903.02(A). Its purpose is "to protect the interests of insureds, claimants, creditors, and the public generally." *Hudson v. Petrosurance, Inc.*, 936 N.E.2d 481, 485 (Ohio 2010). To that end, the Act established a "comprehensive framework" for handling, among other things, the liquidation of insurance companies. *See id.* As part of that framework, the Act tells Ohio courts how to handle litigation against insurance companies liquidated by *other states*. *See* Ohio Rev. Code § 3903.24(A). And it instructs Ohio courts to "give full faith and credit to injunctions against . . . the continuation of existing actions against" liquidated insurers, so long as "such injunctions are included in an order to liquidate an insurer issued pursuant to corresponding provisions in other states." *Id.*

Here it seems clear that Pennsylvania liquidated OneBeacon "pursuant to" a provision "corresponding" to § 3903.24(A). *Compare* 40 Pa. Cons. Stat. § 221.20 *with* Ohio Rev. Code § 3903.18. And Ohio courts have applied § 3903.24(A) to respect the litigation stays imposed by out-of-state liquidators. *See, e.g.*, *State v. Ramos*, 534 N.E.2d 885, 887 (Ohio Ct. App. 1987);

---

[4]As filed, the complaint presented a Federal RICO claim over which the district court exercised federal question jurisdiction and state-law claims over which the district court exercised diversity jurisdiction. So although the trial court dismissed the Federal RICO claim early in the case, it retained original jurisdiction over the state-law claims.

*Ti-Bert Sys., Inc. v. Union Indem. Ins.*, No. 14207, 1990 WL 73647, at \*2 (Ohio Ct. App. May 30, 1990).

The harder question, then, is whether we must also respect Pennsylvania's stay just because an Ohio court likely would. This implicates *Erie* and its offspring. Tracing this lineage is no easy task—the Supreme Court has revisited *Erie* several times since it decided the case. And more than once this led to a decision of "landmark importance" that "did more than simply explicate" *Erie* but "redefined the scope and thrust of *Erie* in such a manner as to yield a new conceptualization of it." Wright & Miller, 19 *Federal Practice and Procedure* § 4504 (3d ed. Apr. 2021 Update) (italics added).

Our starting point is recognizing that we do not have any federal "rule" on point. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010) ("We do not wade into *Erie*'s murky waters unless the federal rule is inapplicable or invalid."). To be sure, we have a "virtually unflagging obligation" to exercise our statutory jurisdiction. *Colo. River*, 424 U.S. at 813. And state courts have no power to restrain us in the exercise of that jurisdiction. *Donovan*, 377 U.S. at 413. But we are unaware of any federal statute or common-law rule that tells us what to do when a state court liquidates a party before us and then attempts to stay the litigation, all while the state whose substantive law we are applying counsels its own courts to respect that stay. That leaves us with a "relatively unguided *Erie* choice." *Hanna v. Plumer*, 380 U.S. 460, 471 (1965).

"When there is no Federal Rule or federal statute or federal common law directly on point, a good starting place for analyzing an *Erie* problem is *Byrd v. Blue Ridge Rural Electric Cooperative, Incorporated*." Wright & Miller, *supra* § 4511 (italics added); *see also Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1146 (5th Cir. 1997). And *Byrd* directs our attention to a few considerations. Thus, in evaluating whether to apply § 3903.24(A), we consider the federal interests at stake and how much the state rule is "bound up" with the parties' rights and obligations. *See Byrd v. Blue Ridge Rural Elec. Coop., Inc.*, 356 U.S. 525, 536–37 (1958). We also consider "whether the litigation would come out one way in the federal court and another way in the state court if the federal court failed to apply a particular local rule." *Id.* This last consideration is hardly dispositive, though, and "its application must be guided by 'the twin aims

of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'" *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 428 (quoting *Hanna*, 380 U.S. at 468); *see also Fragoso*, 991 F.2d at 881 (applying the same framework).

These concerns do not strongly support deferring to Pennsylvania's stay here. For starters, there is a strong federal interest in courts exercising their jurisdiction and resolving the cases before them. *See Byrd*, 356 U.S. at 537; *see also Quackenbush*, 517 U.S. at 728. And the issue we face is about whether to apply a *stay*. A stay does not resolve the litigation on its merits. It just delays its resolution. So the application of § 3903.24(A) is not "outcome determinative" in any substantive sense of the phrase. *See Fragoso*, 991 F.2d at 882. Moreover, § 3903.24(A) does not affect or suspend OneBeacon's rights or liabilities; it simply states a preference about when, where, and by whom claims against liquidated entities should be resolved. In other words, it "appears to be merely a form and mode of" resolving claims against liquidated entities, "not a rule intended to be bound up with the definition of the rights and obligations of the parties." *Byrd*, 356 U.S. at 536.

Likewise, we find it hard to believe that our moving forward with this appeal would somehow encourage litigants to forum shop. Indeed, the remote possibility that a defendant will be liquidated during litigation is unlikely to influence a plaintiff's forum selection. *See Fragoso*, 991 F.2d at 881. And finally, our declining to apply § 3903.24(A) would not be inequitable. True, state litigants against OneBeacon would likely have to wait to resolve their suit or go before the liquidator. But that does not change the substantive rules governing OneBeacon's liability. If the case were resolved in Ohio state court, Ohio law would govern OneBeacon's liability. If it were resolved in Pennsylvania as part of the liquidation, Ohio law would govern OneBeacon's liability. And if it were resolved in federal court, Ohio law would govern OneBeacon's liability.

In the end, § 3903.24(A) functions as a forum provision, stating a preference about where and how to resolve claims against liquidated insurers. But as we learned from *Byrd*, a local rule dictating "who decides" does not, by itself, force a federal court's hand. *See* 356 U.S. at 536; *see also Schriro v. Summerlin*, 542 U.S. 348, 353 (2004). Because we have an interest in exercising

our jurisdiction, and the interests underlying *Erie* and its progeny do not counsel otherwise, we do not apply § 3903.24(A) to stay resolution of this appeal.

III.

With all that out of the way, we can finally turn to the merits. On interlocutory appeal, we review a district court's denial of a motion to dismiss de novo. *Hicks v. State Farm Fire & Cas. Co.*, 751 F. App'x 703, 706 (6th Cir. 2018). "As the text of § 1292(b) indicates, appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). So we "may address any issue fairly included within the certified order." *Id.*

We deal with this appeal in two steps. We first address whether the state court judgment satisfies the elements of claim preclusion. Then we ask whether any exceptions to claim preclusion apply—including the equitable exception in § 26(1)(f) of the Restatement (Second) of Judgments. Ohio law governs both questions. *See Hapgood v. City of Warren*, 127 F.3d 490, 493 (6th Cir. 1997) ("[W]hen asked to give preclusive effect to a prior state court judgment, a federal court must look to the law of the rendering state to determine whether and to what extent that prior judgment should receive preclusive effect in a federal action.").

A.

Start with the first issue: claim preclusion. Ohio has "adopted an expansive view of claim preclusion." *Holzemer v. Urbanski*, 712 N.E.2d 713, 716 (Ohio 1999). Under Ohio law, "a valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action." *Grava v. Parkman Twp.*, 653 N.E.2d 226, 229 (Ohio 1995); *see also* Restatement (Second) of Judgments § 24. In other words, "an existing final judgment or decree between the parties to litigation is conclusive as to all claims which were *or might have been* litigated in a first lawsuit." *Grava*, 653 N.E.2d at 229 (quoting *Nat'l Amusements, Inc. v. City of Springdale*, 558 N.E.2d 1178, 1180 (Ohio 1990)). So a plaintiff must present every ground for relief in his first action, or res judicata will bar him from later asserting it. *Id.*; *see also O'Nesti v. DeBartolo*

*Realty Corp.*, 862 N.E.2d 803, 806 (Ohio 2007) ("Where a claim could have been litigated in the previous suit, claim preclusion also bars subsequent actions on that matter.").

We have broken down Ohio claim preclusion into four pieces. First, there must be "a prior final, valid decision on the merits by a court of competent jurisdiction." *Hapgood*, 127 F.3d at 493. Second, there must be a second action involving the same parties (or their privies) as the first. *Id.* Next, the second action must raise "claims that were or could have been litigated in the first action." *Id.* And finally, the second action must "aris[e] out of the transaction or occurrence that was the subject matter of the previous action." *Id.*

Of these four elements, only the last is at issue.[5] So we must decide whether WPC's state claims for breach of contract arise from the same transaction or occurrence as its federal claims for breach of contract and bad faith.

1.

As it has for claim preclusion more broadly, Ohio has adopted the Restatement view of a "transaction or occurrence." *See Grava*, 653 N.E.3d at 229. The Restatement defines a transaction as a "common nucleus of operative facts," *id.*, which "connotes a natural grouping," Restatement (Second) of Judgments § 24, cmt. b. To satisfy this test, two sets of claims need only be "logically related" to each other. *Lisboa v. City of Cleveland Heights*, 576 F. App'x 474, 476 (6th Cir. 2014) (quoting *Rettig Enters., Inc. v. Koehler,* 626 N.E.2d 99, 103 (Ohio 1994)). This is a practical standard—if the claims "are related in time, space, origin, or motivation," if "they form a convenient trial unit," or if "their treatment as a unit conforms to the parties' expectations," they are part of the same transaction. Restatement (Second) of Judgments § 24(2).

That said, a litigant cannot avoid claim preclusion just by presenting different legal theories or creatively shading the facts. *Grava*, 653 N.E.2d at 229. So "[i]t is irrelevant whether 'the facts necessary to obtain relief' in a second suit differ from those in the first, so long as the

---

[5]Although the Court of Appeals partially reversed the trial court's judgment on appeal, the affirmed part of the judgment satisfies claim preclusion's finality element. *See Shimko v. Lobe*, 790 N.E.2d 335, 347–48 (Ohio Ct. App. 2003). And at any rate, WPC concedes finality.

'nucleus of facts' at issue in the second suit 'was the subject matter' of the first." *Talismanic Props., LLC v. City of Tipp City*, 742 F. App'x 129, 132 (6th Cir. 2018) (quoting *Grava*, 653 N.E.2d at 228–29). Thus, claim preclusion is appropriate when the "factual basis" for the legal challenge is "easily discernible in the earlier litigation, and no new significant facts have been alleged that would entitle the [party] to avoid the effect of res judicata." *City of Canton v. Maynard*, 766 F.2d 236, 239 (6th Cir. 1985) (per curiam).

We turn to the two sets of claims here. Recall the gist of the state complaint.[6] WPC's first claim was that OneBeacon "unilaterally imposed an improper pro rata allocation method to allocate claim payments to the General Accident Policies." (R. 168-2, Second Am. State Compl. at 7, PageID # 4085.) "The effect was . . . a dramatic reduction in coverage and increase in costs to Powell." (*Id.*) WPC's second claim was that OneBeacon breached WPC's General Accident policies in two ways. One, by "forc[ing] Powell to pay portions of the indemnity and defense costs for claims made on the Excess Policies." (R. 168-2, Second Am. State Compl. at 4, 7, PageID # 4082, 4085.) And two, by "improperly appl[ying] claim payments to multiple annual periods." (*Id.* at 8, PageID # 4086.)

WPC's federal complaint sounds familiar. It accuses OneBeacon of bad faith in "handling, processing, pay[ing], and satisf[ying]" claims against WPC. (R. 1, Compl. at 21, PageID # 21.) OneBeacon allegedly limited its investigations, delayed communication of coverage decisions, made unilateral litigation decisions, and refused to fund settlements or pay local counsel. This "wrongfully eroded Powell's insurance coverage" and "forc[ed] Powell to bear indemnity and defense costs that were not Powell's responsibility." (*Id.*) WPC's breach of contract claim echoes its bad faith claim: "By its denials of coverage and failures to defend, OneBeacon breached the General Accident Policies, all to Powell's damage in payments for defense and indemnity." (*Id.* at 22, PageID # 22.)

---

[6]WPC thinks we ought to look at the very first complaint it filed to determine the res judicata effect of the judgment at issue. We disagree. The operative complaint is the second amended state complaint—that's the one that produced the judgment that we are checking for preclusive effect. Besides, "[a]n amended complaint supersedes and replaces the original complaint." *Hidey v. Ohio State Highway Patrol*, 689 N.E.2d 89, 91 (Ohio Ct. App. 1996).

These two sets of claims arise from the same transaction—that is, the same nucleus of operative fact. Both flow from OneBeacon's conduct during its indemnification and defense of WPC against asbestos litigation. More to the point, WPC's state suit alleged OneBeacon breached its contractual obligations by "forc[ing] Powell to pay portions of the indemnity and defense costs for claims made on the Excess Policies." (R. 168-2, Second Am. State Compl. at 4, 7, PageID # 4082, 4086.) That's nearly identical to the language WPC used in its federal bad faith claim. (R. 1, Compl. at 21, PageID # 21 (faulting OneBeacon for "forcing Powell to bear indemnity and defense costs that were not Powell's responsibility").) Same with the breach of contract claim. (*Id.* at 22, PageID # 22 ("By its denials of coverage and failures to defend, OneBeacon breached the General Accident Policies, all to Powell's damage in payments for defense and indemnity.").) Likewise, WPC said in state court that OneBeacon "improperly applied claim payments" and "prematurely reduc[ed]" WPC's coverage. (R. 168-2, Second Am. State Compl. at 8, PageID # 4086.) That sounds a lot like bad faith in "handling, processing, pay[ing], and satisf[ying]" claims against WPC. (R. 1, Compl. at 21, PageID # 21.)

So in both suits, WPC points to the same harm—that it had to bear some of its own indemnity and defense costs—from the same nucleus of fact—OneBeacon's conduct in indemnifying and defending WPC against asbestos litigation. And both actions arise from the same set of insurance policies and the parties' obligations under them. *See Talismanic Props.*, 742 F. App'x at 132 (holding that claims arose from the same transaction or occurrence when they arose from the same agreement as claims in an earlier suit, even though the requested relief changed); *see also U.S. Bank Nat'l Ass'n v. Gullotta*, 899 N.E.2d 987, 991 (Ohio 2008) ("However, all of the claims in all of the complaints filed by U.S. Bank against Gullotta arise from the same note, the same mortgage, and the same default.").

Thus, the claims were related in origin—WPC's insurance policies with OneBeacon—and motivation—WPC's effort to get OneBeacon to defend and indemnify it in accordance with those policies. *See* Restatement (Second) of Judgments § 24(2). Even more, the factual basis for WPC's federal claims was "easily discernible in the earlier litigation"—WPC filed its second amended complaint in the state action *after* it filed its federal lawsuit. *See Maynard*, 766 F.2d at

239. And claim preclusion blocks claims that were or *could have been* litigated in the first action. *Grava*, 653 N.E.2d at 229.

That claim preclusion now bars WPC's federal suit makes sense considering *Colorado River*, 424 U.S. at 800, and its progeny. Recall that the district court here agreed with OneBeacon that WPC's state court judgment likely satisfied the elements of claim preclusion. But instead of dismissing the case, the court stayed it under *Colorado River*.

Why does that matter? The Supreme Court in *Colorado River* held that in exceptional cases, interests in judicial efficiency and resource conservation favor staying a federal case when a parallel state case is also pending. 424 U.S. at 817. But importantly, these stays "effectively end the litigation in federal court." *RSM Richter, Inc. v. Behr Am., Inc.*, 729 F.3d 553, 556 (6th Cir. 2013). That's "because the district court would be bound, *as a matter of res judicata*, to honor the state court's judgment." *Quackenbush*, 517 U.S. at 713 (emphasis added); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 10 (1983) ("Hence, a stay of the federal suit pending resolution of the state suit meant that there would be no further litigation in the federal forum; the state court's judgment on the issue would be res judicata.").

Put differently, in parallel state and federal proceedings, the first to reach judgment will usually bar the other. *Quackenbush*, 517 U.S. at 713. "Where the judgment sought is strictly *in personam*, for the recovery of money . . . both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as *res adjudicata* in the other." *Penn Gen. Cas. Co. v. Commonwealth of Penn. ex rel. Schnader*, 294 U.S. 189, 195 (1935); *see also Quality Assocs., Inc. v. Proctor & Gamble Distrib., LLC*, 949 F.3d 283, 289 (6th Cir. 2020). That's what happened here. And so claim preclusion applies.

2.

WPC resists claim preclusion with several unsuccessful arguments. WPC first contends that its bad-faith claim in federal court is a cause of action independent of its breach-of-contract claims in state court. WPC cannot get far on this theory. "That a number of different legal theories casting liability on an actor may apply to a given episode does not create multiple

transactions and hence multiple claims." *Grava*, 653 N.E.2d at 229 (quoting Restatement (Second) of Judgments § 24 cmt. c); *see also* Restatement (Second) of Judgments § 25(2) ("The rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action . . . [t]o seek remedies or forms of relief not demanded in the first action.").

WPC also argues that different evidence supports each set of claims. This argument fails for two reasons. First, "[i]t is irrelevant whether 'the facts necessary to obtain relief' in a second suit differ from those in the first, so long as the 'nucleus of facts' at issue in the second suit 'was the subject matter' of the first." *Talismanic Props., LLC*, 742 F. App'x at 132 (quoting *Grava*, 653 N.E.2d at 228–29). Put differently, "even when there is not a substantial overlap [in evidence], the second action may be precluded if it stems from the same transaction or series." Restatement (Second) of Judgments § 24 cmt. b; *see also id.* § 25(1) ("The rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action . . . [t]o present evidence . . . not presented in the first action."). And second, OneBeacon's counsel pointed out at the hearing on its motion to dismiss that he would have called many of the witnesses from the state trial to testify in the federal case. So there is some factual overlap between the two sets of claims.

Finally, in its effort to distance its state from its federal claims, WPC cites an unpublished opinion from the Ohio Court of Appeals, *Geiger v. Westfield Nat'l Ins. Co.*, No. C–080355, 2008 WL 5412490 (Ohio Ct. App. Dec. 31, 2008). *Geiger* held that a previous suit to establish insurance coverage did not preclude a later suit for the insurance company's bad faith in handling a claim. *Id.* at *2.

But for a few reasons WPC's reliance on *Geiger* is misplaced. To start, even were it published, *Geiger* would not be binding authority outside the appellate district that decided it. *See State v. Thompson*, 950 N.E.2d 1022, 1025 (Ohio Ct. App. 2011); *see also State v. Hoffman*, 25 N.E.3d 993, 1006 (Ohio 2014). And it conflicts with other Ohio authority suggesting that bad faith and breach of contract claims arise from the same transaction or occurrence as a previous suit to establish insurance coverage. *See, e.g.*, *Canty v. Auto-Owners Mut. Ins. Co.*, No. 14AP-

46, 2014 WL 2583476, at *3 (Ohio Ct. App. June 10, 2014); *Colleli & Assocs., Inc. v. Cincinnati Ins. Co.*, No. 2004–AP–04–0029, 2004 WL 2937384, at *7 (Ohio Ct. App. Dec. 13, 2004).

*Geiger* also conflicts with the "modern" approach to claim preclusion that the Ohio Supreme Court adopted in *Grava*. *See Grava*, 653 N.E.2d at 229 (noting that "we expressly adhere to the modern application of the doctrine of *res judicata*, as stated in" the Restatement). *Geiger* defined a "transaction" by relying on a partially overruled 1943 Ohio Supreme Court case called *Norwood v. McDonald*, 52 N.E.2d 67 (Ohio 1943). Under *Norwood*, if "two actions rest upon different states of facts, or if different proofs would be required to sustain the two actions, a judgment in one is no bar to the maintenance of the other." *Norwood*, 52 N.E.2d at 71; *see also Geiger*, 2008 WL 5412490, at *2 (citing *Norwood*). But the Restatement, endorsed in *Grava*, says otherwise. Under § 24, overlapping evidence means "the second action should ordinarily be held precluded." But the reverse is not true—"*even when there is not a substantial overlap*, the second action may be precluded if it stems from the same transaction or series." Restatement (Second) of Judgments § 24, cmt. b (emphasis added). In other words, overlapping evidence is not, as *Geiger* suggests, necessary to unite two lawsuits in a common transaction. *See* Restatement (Second) of Judgments § 25(1) ("The rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action . . . [t]o present evidence . . . not presented in the first action.").

Finally, even if none of that were true, this case is distinguishable from *Geiger*. In *Geiger*, the first action sought "to prove [uninsured motorist] coverage," and the second concerned the insurer's "actions in processing the Geigers' UIM claim." 2008 WL 5412490, at *2. But here, *both* the first and second suits concerned OneBeacon's actions in processing and handling WPC's claims. So WPC's first suit was not one merely to establish coverage. It instead accused OneBeacon of "refus[ing] to implement [WPC's] allocation selections," "improperly appl[ying] claim payments," and forcing WPC to bear some of its own indemnity and defense costs. (R. 168-2, Second Am. State Compl. at 7, PageID # 4085.) Nearly identical allegations appear in the second suit. So *Geiger* does not rescue WPC from res judicata.

In short, the state court judgment here satisfies the elements of claim preclusion.

B.

The final thing that we consider is § 26 of the Restatement, which contains various exceptions to claim preclusion. The district court relied on one of these exceptions in denying OneBeacon's motion to dismiss. But WPC argues that three apply. First, it says OneBeacon "acquiesced" in its claim splitting. *See* Restatement (Second) of Judgments § 26(1)(a). Next, it says that the state court "expressly reserved" its right to maintain its federal lawsuit. *Id.* § 26(1)(b). And finally, it says (and the district court agreed) that "an extraordinary reason" disfavors applying claim preclusion. *Id.* § 26(1)(f). The "extraordinary reason" WPC cites is that the district court refused to dismiss or stay the federal litigation and allowed the state and federal actions to continue simultaneously for years.

1.

At the outset, we address a forfeiture issue. OneBeacon says that this is the first time it's hearing about the § 26(1)(a) and (b) exceptions, so WPC forfeited those arguments. And WPC does not try hard to contest that. Because this is a § 1292(b) appeal, we can "address any issue fairly included within the certified order because 'it is the *order* that is appealable, and not the controlling question identified by the district court.'" *Yamaha Motor Corp.*, 516 U.S. at 205 (citation omitted). An issue is "fairly included" in the certified order "when it was raised in the district court and the parties presented it in their appellate briefs." *See United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1042 (5th Cir. 2016). But "an issue was not fairly included when it was not raised in the district court." *Id.* So the fact that this is an interlocutory appeal under § 1292(b) does not suspend the normal rules of forfeiture. *See Kennedy v. City of Cleveland*, 797 F.2d 297, 300 (6th Cir. 1986).

To be sure, there may be times, in an interlocutory setting (as elsewhere), when it is appropriate for us to address arguments not raised below. *See* Wright & Miller, *supra* § 3929 ("[D]espite the usual reluctance to consider an argument not made below, the prospect of further proceedings after disposition of the interlocutory appeal may make it desirable to entertain the argument as part of the appeal."). This is not one of those times. Neither the district court, WPC, nor OneBeacon suggested below that the § 26(1)(a) or (b) exceptions should apply.

And there is no prospect of further litigation on these exceptions following this appeal. So we elect not to consider them.

2.

With that settled, we turn to § 26(1)(f). WPC says this exception should apply because it would be unfair to dismiss the lawsuit. After all, the district court declined to stay the case early on, allowing it to proceed alongside the state case for years.

We disagree. True, § 26(1)(f) is an exception to the normal rule against claim splitting. But it applies only when "[i]t is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for an extraordinary reason." Restatement (Second) of Judgments § 26(1)(f). And the Restatement cautions us that such reasons are "not lightly to be found." *Id.* § 26 cmt. i. To put a finer point on it: the examples the Restatement gives of "extraordinary" situations involve penal custody, child custody, and civil commitment of the mentally ill. *Id.*

Right off the bat, then, this does not look like a case when § 26(1)(f) should apply. And the same is true on closer inspection. As we have already noted, "both a state court and a federal court having concurrent jurisdiction may proceed with the litigation, at least until judgment is obtained in one court which may be set up as *res adjudicata* in the other." *Penn Gen. Cas. Co.*, 294 U.S. at 195. In other words, two proceedings touching the same subject matter can proceed separately in state and federal court, and the one to reach judgment first may bar the other. *See Quality Assocs., Inc.*, 949 F.3d at 288–89; *Lesher v. Lavrich*, 784 F.2d 193, 195 (6th Cir. 1986). So it is not inequitable to let both proceedings go forward and then use the first action that reaches judgment to bar the other. In fact, that is exactly what the general rule says should happen. *See Penn Gen. Cas. Co.*, 294 U.S. at 195; *Quality Assocs., Inc.*, 949 F.3d at 289.

Likewise, the district court declining to stay this case early on—thus allowing the simultaneous litigation—says little about the potential for one judgment to bar the other. That's because "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colo. River*, 424 U.S. at 813. It "is an extraordinary and narrow exception" to federal courts'

duty to decide the cases before them, one a district court should apply only in "exceptional circumstances." *Id.* So "as between state and federal courts, the rule is that 'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.'" *Id.* at 817 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)). This all flows from federal courts' "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Id.* And it means that "the mere pendency of a state-court case concerning the same subject matter as a federal case is not reason enough to abstain." *RSM Richter, Inc.*, 729 F.3d at 557.

In other words, the district court followed the general rule here by allowing the case to proceed after OneBeacon's first motion to dismiss. And the district court obeying its "virtually unflagging obligation" to exercise its jurisdiction, *Colo. River*, 424 U.S. at 817, coupled with the general rule that courts should allow cases touching the same subject matter in different courts to proceed and *then* apply res judicata, *Quality Assocs., Inc.*, 949 F.3d at 288, is not inequitable. If anything, that's what the traditional rules of claim preclusion instruct courts to do.

Section 26(1)(f) of the Restatement does not salvage WPC's federal lawsuit.

IV.

OneBeacon's persistence has paid off. It successfully argues that claim preclusion is a bar to this lawsuit. For the reasons we state above, we **REVERSE** the judgment of the district court and **REMAND** the case for proceedings consistent with this opinion.

---

### CONCURRING IN PART AND DISSENTING IN PART

---

WHITE, Circuit Judge, concurring in part and dissenting in part.  I join Part II of the majority's thoughtful opinion and in Part III.B's discussion of the Restatement exceptions to claim preclusion.  I do not, however, agree with the majority's conclusion that claim preclusion applies.  Although it is a close question, I am not convinced that the federal action is based on the same "transaction and occurrence" as the state action.  The latter focuses exclusively on contract interpretation; the former involves allegations of bad-faith conduct having nothing to do with contract interpretation.

### I.

As the majority correctly notes, claim preclusion under Ohio law has four elements: (1) a prior final, valid decision on the merits; (2) a second action involving the same parties (or their privies) as the first; (3) a second action raising claims that were or could have been litigated in the first action; and (4) a second action arising out of the "transaction or occurrence" that was the subject matter of the previous action.  *Moore, Successor Tr. of Clarence M. Moore and Laura P. Moore Tr. v. Hiram Twp.*, 988 F.3d 353, 357 (6th Cir. 2021) (citation omitted).  Only the fourth element is disputed.  I do not think it has been established here.  Before explaining why, I briefly review some of the relevant factual background.

### A.

In 2011, WPC sued OneBeacon in state court, requesting declaratory relief.  It asked the court to answer several questions: (1) whether the aggregate limits in the primary policies were annual and what those limits were; (2) whether WPC had a right to "allocate" (i.e., deduct) payments made to asbestos claimants from a single chosen policy that had been triggered (as WPC wanted), or whether instead OneBeacon could deduct these payments pro rata from all triggered policies at once; and (3) whether OneBeacon had to pay 100% of defense and indemnity costs related to claims triggering coverage under WPC's excess policies.  R. 17-1 PID 92-96.  These questions turned solely on matters of contract interpretation.

WPC later amended its state-court declaratory-judgment complaint to allege breach-of-contract claims regarding the latter two issues, arguing that OneBeacon breached the contract by adhering to the wrong allocation method (and refusing WPC's requests to use what WPC said was the right allocation model) and, "[c]ontrary to the[] plain language" of the excess policies, R. 168-2 PID 4083, only paying a portion (rather than 100%) of the costs for each claim allocated to the excess policies. Although the relief sought changed from a declaratory judgment to damages for breach, the central issues (turning on contract interpretation) remained the same.

**B.**

Unlike the state-court lawsuit—which focused on interpretation of the various insurance policies issued to WPC—the federal suit focuses largely on the behavior of OneBeacon (and its claims administrator) in processing, defending, and settling individual asbestos claims (as opposed to the more abstract legal question of how the costs would be distributed, in general, when a claim triggered a policy).

To be sure, some of the allegations in the federal lawsuit are similar to those in the state lawsuit. For example, the federal suit alleges that OneBeacon's claims administrator "disputed the terms and limits of Powell's coverage under the" primary coverage policies and "maintained a secret payment allocation formula" it had not disclosed to WPC. R. 1 PID 10. That is similar to WPC's claims in state court that OneBeacon was using the wrong contractual allocation methods. I agree that these claims are precluded.

But most of the allegations in the federal action accuse OneBeacon of bad-faith conduct that has nothing to do with the contract-interpretation questions in the state lawsuit. For example, the complaint alleges that OneBeacon (through its claims administrator):

- Refused to take on the defense of one litigant's asbestos lawsuit on the basis that the plaintiff's first date of exposure was in the late 1970's despite evidence from local defense counsel that the plaintiff's exposure could have begun as early as 1974.

- Caused local defense counsel in one asbestos case to change an alleged exposure date of a plaintiff from 1976 (within a OneBeacon coverage period) to 1978 (outside OneBeacon's coverage period), without telling WPC, and then denied

WPC's claim for reimbursement after WPC settled with the litigant, citing the changed date.

- Began requiring litigants, starting in 2013 (and despite longstanding practice to contrary) to sign affidavits affirming they actually worked with WPC's valves as a condition of settlement—undermining standing agreements in principle with repeat plaintiffs' counsel.

- Instructed defense counsel in one case not to contact WPC and to withhold relevant cost numbers and exposure dates, even though counsel was representing WPC and WPC was paying a portion of the defense costs.

- Delayed funding settlements already agreed upon, damaging WPC's credibility with plaintiffs' counsel and causing higher subsequent settlement demands.

WPC alleges that OneBeacon—in collusion with its claims administrator and a third party to whom it sold its claims reserves—made unilateral investigation and defense decisions, cutting WPC out of the picture, in order to "defraud[ WPC] out of its insurance coverage" and maximize profit. R. 1 PID 21.[1]

## C.

So, summed up, the central focus of the state lawsuit was determining what certain provisions meant in several insurance contracts entered into from the mid-1950s to the mid-1970s. The central focus of the federal lawsuit was whether OneBeacon—starting in the early 2000s, when asbestos-exposure claims started to pile up—directed its claims administrator to interfere in bad faith with the individual litigation of those underlying asbestos claims. The state action turned solely on what the parties meant when they entered the contracts in the 1950s to 1970s; the federal action did not turn at all on what those contracts meant.

---

[1]The federal complaint also alleged a RICO conspiracy between OneBeacon, a Berkshire Hathaway subsidiary to which OneBeacon sold its claims reserves, and OneBeacon's claims administrator. The thrust of the allegation was that these other entities all conspired to delay and prevent WPC's asbestos claims from being paid out in a timely manner in an effort to maximize profit from OneBeacon's claim reserves. Several RICO-related claims against the non-OneBeacon defendants were dismissed in 2014 and are not a part of this appeal. But the allegations forming the basis of the bad-faith claim were made in the context of this wider-ranging RICO conspiracy theory.

## II.

Ohio follows the Restatement (Second) of Judgments in defining what constitutes a "transaction and occurrence." *Grava v. Parkman Twp.*, 653 N.E.2d 226, 229 (Ohio 1995). The relevant provision of the Second Restatement, § 24, provides that a final judgment on a claim extinguishes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." Restatement (Second) of Judgments § 24(1). "What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.* § 24(2). This inquiry is "pragmatic" and depends heavily on the facts of each given case. *Id.* § 24 cmt. b.[2]

The state contract action and federal bad-faith claim are not, for the most part, related in time or origin. As noted, the state lawsuit focuses on how to interpret insurance policies executed, in some instances, a half-century before any of the actions underlying the bad-faith action began. Nor do the two actions "rest on the same or a substantially similar factual basis" or "seek redress for essentially the same basic wrong." *Porn v. Nat'l Grange Mut. Ins. Co.*, 93 F.3d 31, 34 (1st Cir. 1996).[3] The bad-faith claim alleges that OneBeacon, among other

---

[2]A comment to the Restatement provides further guidance:

> In general, the expression connotes a natural grouping or common nucleus of operative facts. Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes. Though no single factor is determinative, the relevance of trial convenience makes it appropriate to ask how far the witnesses or proofs in the second action would tend to overlap the witnesses or proofs relevant to the first. If there is a substantial overlap, the second action should ordinarily be held precluded. But the opposite does not hold true; even when there is not a substantial overlap, the second action may be precluded if it stems from the same transaction or series.

*Id.* § 24 cmt. b.

[3]Though *Porn* is a First Circuit decision, not an Ohio state-court decision, it applied the Restatement (Second) approach and is frequently cited by other decisions applying the Restatement. *See, e.g., Villareal v. United Fire & Cas. Co.*, 873 N.W.2d 714, 723 (Iowa 2016) ("Perhaps the most cited authority in this area is the First Circuit's decision in *Porn*[.]" (citation omitted)).

things, directed defense counsel not to tell WPC about litigation decisions in specific asbestos cases, caused counsel to misrepresent that certain asbestos litigants were exposed in years that OneBeacon's policies did not cover, and in bad faith began making it more difficult to settle with plaintiffs' counsel—for instance, by requiring asbestos litigants to sign affidavits that they personally worked with WPC's pipes as a condition of settlement. These are the actions that form the "wrong" for which the bad-faith claim seeks redress. They are completely distinct from the "wrong" for which the state-court action seeks redress—that OneBeacon misinterpreted and misapplied the allocation terms of the underlying contract policies. The actions underlying the bad-faith claim make no difference to the state-court action's questions of contract interpretation. And the resolution of those contract-interpretation questions makes no difference in assessing the bad-faith claim.

For similar reasons, the two claims would not make a "convenient unit for trial purposes." Restatement (Second) of Judgments § 24 cmt. b. As WPC notes, the "primary witnesses" in support of the bad-faith claim would be "the asbestos defense attorneys retained by OneBeacon on [WPC's] behalf," and the "relevant documents . . . will be those created in the course of OneBeacon's present-day handling of the claims—***not*** the insurance policies that OneBeacon's predecessor issued more than a half-century ago." WPC Br. at 11. The majority responds to this point by citing OneBeacon's statement in the district court that it planned to call many of the same witnesses from the state-court action if the bad-faith claim went to trial. Majority Op. at 20. But counsel for WPC pointed out later in the same hearing:

> [WPC Counsel]: In the state court case, we had witnesses talking about insurance policies that were agreed to in the '50s, in the '60s, in the '70s that were essentially 50 or 60 or 70 years old. Those were the issues in that case. What does "drop down" mean? What does "attachment" mean? What is a "date of first exposure" or DOFE? What is "underlying"? What do those concepts mean? That's what the case was about, and those terms were drafted and agreed to as early as 1950. In the bad faith case, we're talking about claims handling that took place in 2014 or afterwards. There was no common nucleus of operative fact. The facts were unrelated in terms of time, space, origin, or motivation.
>
> . . . To illustrate, Your Honor, one of the bad faith allegations, an example of it, with these asbestos cases, the plaintiff's counsel often sue 30, 40, 50, a hundred [defendants] in one action. . . . The plaintiff's counsel may submit a settlement demand of $5,000, you get out of the case, each of them. And let's assume, for

example, 99 out of the 100 [defendants] settles up very early on, get out of the case. OneBeacon would oftentimes, and this is the proof that we'll put on in connection with the bad faith case that was not tried in state court, forces . . . [WPC] to stay involved in these cases, incur expenses, erode coverage, and then three years later we're forced to settle the case for $250,000 as opposed to $5,000. That is one example of the bad faith. There was not one witness who testified about that in state court. The claims are totally separate and distinct.

R. 192 PID 4700-01, 4704.

To be sure, in some, perhaps many, cases involving bad-faith and breach-of-contract insurance claims, it may be that the two claims do form a convenient trial unit. For example, a company might sue its insurance provider for coverage arising from a single incident, and the coverage dispute may turn on whether there was any coverage at all. The answer to that question would likely shed light on whether the insurer acted in bad faith in refusing to tender coverage. *See, e.g.*, *Porn*, 93 F.3d at 35 ("[T]he facts of the car accident are also probative of National Grange's reasonableness in refusing to pay Porn's claim."). Similarly, the coverage question whether two policies can be stacked under the terms of the policies would be woven together with the question whether the insurance company acted in bad faith in refusing to tender the full amount of both policies. But here, all agree there was coverage and an obligation to defend; the state-court dispute was about how to allocate coverage and costs, not a disagreement about whether the obligation exists in the first place. In this case, the answers to the coverage questions—i.e., which "primary" and "excess" policies are triggered, whether WPC can direct the allocation to specific policies, and whether OneBeacon has to pay 100% reimbursement for excess-policy claims or some lower proportional amount—make no difference to and have no relation to the bad-faith questions.

I acknowledge that this is a difficult issue. And some of the Restatement factors may cut in the other direction. For example, one of the Restatement factors is whether the two actions are related in "motivation," and arguably the actions here are. WPC wants to recoup as much money as it can from OneBeacon in connection with the liability it has been exposed to as a result of mounting asbestos claims. And the actions of OneBeacon for which WPC seeks redress are allegedly motivated by a desire to pay as little as possible under the policies.

But still, one of the overriding inquiries—indeed, *the* overriding inquiry—is whether the two actions share a common nucleus of operative facts. For the reasons discussed above, in my view they do not. Accordingly, I respectfully disagree with the majority that the two actions are based on the same "transaction and occurrence," and would affirm.